**In re ESTATE OF Grace N. WILLIAMS, Deceased.**

**Ralph E. WILLIAMS, Executor, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15503.**

United States Court of Appeals Ninth Circuit.

Jan. 28, 1958.

John L. Flynn, Burton L. Coan, Portland, Or., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Arthur I. Gould, John N. Stull, Robert N. Anderson, Charles B. E. Freeman, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HEALY, FEE and HAMLEY, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

The Tax Court determined that a growing crop of hops on July 31, 1952, at which date taxpayer acquired it as a liquidating dividend, was of the fair market value of $11,500.00. I.R.C.1939, sec. 111(a, b), 26 U.S.C.A. § 111(a, b). Timely petition for review of the decision was filed in this Court.

The Eola Hop Farms were operated by Grace N. Williams, since deceased, as sole proprietor from some date in 1950 to March 1, 1951, when the assets and liabilities were transferred to Eola Hop Farms, Inc., a corporation, in exchange for all the capital stock thereof. This corporation operated from the last date until July 31, 1952, when it was dissolved by vote of stock of decedent. Thereafter, farming operations were carried on by decedent as a sole proprietorship. The growing crop of hops was transferred to decedent while not matured, but for all practical purposes no risk of loss by mildew or other crop diseases existed. Decedent operated through the harvest and sale of the crop. In 1953, the hop vines were pulled up and hop growing abandoned. The growing of hops had been less and less profitable since 1950, owing largely to the allocations of salable percentages by the Secretary of Agriculture. After 1953, owing to throwing open the market and foreign competition, it ceased to produce anything but losses.

The concept of fair market value controls the computation of the value of the growing crop. By definition, fair market value means the price at which a willing buyer and a willing seller would arrive, after negotiation for sale, where neither is acting under compulsion.[1]

First, it is argued that the Tax Court committed fundamental error because the record shows that decedent would not have sold at a price less than the cost of production on July 31, 1952. At best, that argument is one-sided, as it does not take account of the price a willing buyer

---

1. See Elmhurst Cemetery Co. of Joliet v. Commissioner, 300 U.S. 37, 39, 57 S. Ct. 324, 81 L.Ed. 491; A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 182 F.2d 300, 303; Tracy v. Commissioner, 6 Cir., 53 F.2d 575, 577.

would pay on that date, considering all the circumstances. It is noteworthy that decedent set that date by dissolution of the corporation.

The period was not established by the government or the Commissioner. If decedent had desired to take a chance upon the computation of fair market value at a later date, the dissolution could have been withheld. On the other hand, the crop might have been sold before liquidated. This was her voluntary act.

The tax consequences were held in mind. It is apparent that the decedent, as a taxpayer, was aware prior to the liquidation of Eola Farms, Inc., that she could have obtained the total of the investment of the corporation on July 31, 1952, as a deduction from ordinary income by means of a tax free liquidation. I.R.C., 1939, sec. 112(b) (7), 26 U.S.C.A. § 112(b) (7).

▆▆▆ The sole purpose of this discussion is to indicate that decedent, by dissolution of the corporation on July 31, fixed the date as of which the fair market value must be assessed. Another time could have been chosen when the market price would have been higher or lower. The same elements control and the same tests must be used, whatever date is used. However, there are problems of great intricacy propounded in fixing the market price of a crop in an intermediate state of growth. Decedent is responsible for the choice of date. The record must be examined to discover whether the Tax Court has made any material error in the process of determining fair market value as of the chosen date and whether there is substantial evidence supporting the figure used by the Tax Court in the final computation.

There is uncontroverted evidence in the record that there was a market price established for the growing hops, but that decedent and petitioner, on her behalf, would not accept it because it was too low. However, the event proved that it was not too low because decedent actually sold in the fall at much less than she had expected.[2] Disregarding the latter factor, it is plain that decedent rejected the going market price before the date of liquidation. By deciding to liquidate on July 31, 1952, she determined to accept the fair market price as of that date.

▆▆▆ Next, petitioner claims that the Tax Court was bound by the testimony of experts, who were uncontradicted. This is not the law. The trier of fact is not bound by expert opinion, and may disregard it altogether in decision. It is true that such a course may be arbitrary and capricious and in opposition to the facts in the record proven by direct evidence. Where this is true, an appellate court may reverse. But generally expert opinion is only a guide to the court, where in accordance with the proven facts of the record and where it bears indicia of reliability.[3] Here the expert witnesses based their estimate of fair market price upon their thesis that a grower would not sell on July 31 at a price less than the cost of production. This does not settle the price a willing buyer would offer, as above noted.

The chief contention, inferentially, of petitioner is that the Tax Court did not know anything about the hop business and was therefore incompetent to pass upon the questions involved. However, judges are often called upon to decide contests which involve solution of highly

---

2. The Tax Court found as fact that the average market price of the type of hops here involved was 49 to 52 cents per pound as of July 31, 1952, 30 to 35 cents per pound in the latter part of August, 45 to 50 cents per pound from the middle of October through November, and 50 to 53 cents per pound during December. Petitioner testified that the hops in question were sold "during the months of from October through December."

3. See Bank of California, National Association v. Commissioner, 9 Cir., 133 F. 2d 428, 432; Fitts v. Commissioner, 8 Cir., 237 F.2d 729. 732; Gloyd v. Commissioner, 8 Cir., 63 F.2d 649, 650, certiorari denied, 290 U.S. 633, 54 S.Ct. 52, 78 L.Ed. 551; Tracy v. Commissioner, 6 Cir., 53 F.2d 575, 577.

technical fields of which they possess no expert knowledge or experience.

Petitioner lays great stress upon one feature, which justly might be given great weight against his position. Prior to the time of liquidation chosen by decedent, the Hop Control Board, set up under the Agriculture Market Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., determined the probable salable quantity of the crop of 1952. The figure formed the basis of their recommendation to the Secretary of Agriculture. It was the general practice of the Secretary to adopt this recommendation in determining the salable quantity and, after harvest, to express the quantity as the salable percentage of the crop of each grower. Petitioner and decedent must have known that, upon the basis of this prediction and the estimated size of the crop,[4] approximately thirty-five per cent of the crop for that year would probably not be salable.

■ In accordance with this prediction and recommendation, the Secretary of Agriculture some five months later did adopt a percentage figure in accordance with the prediction as the limitation on the quantity which any grower in the area could sell. Petitioner says the Tax Court erred in assuming that the individual quota had been fixed irrevocably by the Board. That court made no such hypothesis. Indirectly, the Tax Court must have considered the effect of such a pronouncement by brewers, growers and dealers on the board before the critical date would have on the mind of a buyer who was willing to buy but not compelled to buy as of that date. This was not error, but an intelligent use of the legal formula.

■ The fixing of valuation or fair market value of commodities generally is a most distinctive question of fact.[5] Particularly is this true of the fair market value of a growing crop. There the judgment of the trier of fact is almost absolute. It is true the appellate courts will not sustain the findings, if on the record as a whole there are elements of predetermination, arbitrary exercise of power or disregard of essential elements.

■ Here the Tax Court, according to the opinion and transcript of trial, considered the state of maturity of the crop, the possibility of loss from mildew and disease, the yield estimated from the most accurate sources, the market price of similar hops at the time and the prospect of price in the future, the cost of harvesting, the probable salable quantity based upon the forecast by the committee under the industry agreement, the special knowledge of buyers in the industry and the expert testimony offered. Of course, these factors could not be used mathematically to produce a result. The judgment of the fact finder also entered therein.

The determination cannot therefore be said to be wrong by this Court. Perhaps, had the judges of this Court been deciding the question of fact initially, we might have arrived at a different figure. But we are not empowered to reverse upon that ground.

Affirmed.

---

4. There was testimony that beginning July 1, 1952, the Crop Reporting Service made monthly estimates of total crop production.

5. See Penn v. Commissioner, 9 Cir., 219 F. 2d 18, 20; Hamburger v. Commissioner, 9 Cir., 166 F.2d 422, 425.