Joe **GOLDSTEIN** and Lillian Goldstein,
Petitioners,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE,** Respondent.

No. 17318.

United States Court of Appeals
Ninth Circuit.

Jan. 12, 1962.

Walter M. Campbell, Los Angeles, Cal.,
for petitioner.

John B. Jones, Jr., Acting Asst. Atty.
Gen., Tax Division, Meyer Rothwacks, C.
Guy Tadlock, Earl J. Silbert and Carolyn
R. Just, Attys., Dept. of Justice, Wash-
ington, D. C., for respondent.

Before BARNES and JERTBERG,
Circuit Judges, and TAYLOR, District
Judge.

BARNES, Circuit Judge.

This case involves the assessment of a
deficiency in federal income tax for the

year 1953. Appellant [1] filed a joint income tax return for 1953, and received a notice of deficiency in the amount of $28,-404.13. Appellant thereupon filed a petition with the Tax Court for a redetermination of the deficiency under the provisions of Section 272(a) of the Internal Revenue Code of 1939, 26 U.S.C. § 272(a). The Tax Court [2] held that the $40,000.00 profit realized by appellant on the sale of real property to his family corporation, three weeks after he had purchased said property, was a disguised dividend and taxable as ordinary income, rather than a short term gain on the sale of a capital asset. A petition for review was filed in this court. Jurisdiction is conferred upon this court by Section 7482 of the Internal Revenue Code of 1954 (26 U.S.C. § 7482, 1958 Ed.).

The evidence before the Tax Court consisted of stipulations, documents and oral testimony. It may be summarized as follows:

Appellant (and his wife) live in Los Angeles, California. In 1925, when seventeen years of age, appellant, the oldest of five brothers,[3] started a retail grocery business as a sole proprietorship. As his business expanded, he employed his brothers. In September 1945, the business became a limited partnership, with appellant as the sole general partner, and with Edward and appellant, as trustee for Max, as limited partners.

In 1945, the limited partnership leased [4] a parcel of land [5] located on a corner of what is now a major intersection in San Gabriel, California, for a term of fifty years beginning November 1, 1945. Appellant had previously attempted to buy [6] the land but was unable to agree on the terms of a sale with the owner.

On January 1, 1946, this lease, along with the other assets of the limited partnership, was assigned or transferred to The Boys' Market, Inc.,[7] a California corporation, in exchange for its capital stock. When notified of the assignment of the lease, the lessor's attorney advised the partnership that it was not released from its obligations under the lease.

Thereafter, appellant, from time to time, tried to obtain title to the leased land for the business. The minutes of a meeting of the board of directors of the corporation held on January 27, 1953, state that appellant (president) reported

---

1. Appellants—husband and wife—are herein referred to for convenience as appellant; though a joint tax return was filed, the facts primarily involve the husband's business transactions.

2. The findings of fact and opinion of the Tax Court are not reported.

3. The brothers being: Max, Edward, Bernard, and Albert.

4. The lease provided for a rental of $40,-000.00, payable in installments of $800 per year, and contained no provisions for renewal. The lease, among other things, required lessee to construct on the property, at its own expense, a commercial building costing at least $20,000.00. The building was to be completed by November 1, 1946; otherwise lessee was required to post bond as security for completion of the building. All buildings constructed on the premises during the term of the lease were to become a part of the realty, to be delivered to the lessor upon termination of the lease. Lessee was required to pay all taxes, insurance, and other charges against the property. Lessee was entitled to assign the lease, pro-

vided that if the lease was assigned prior to completion of and payment for the original building, lessee was to remain liable for the performance of all covenants of the lease as though no assignment had been made; if assigned after completion of the building the lessee would not, without the written consent of the lessor, be released or discharged from any obligation thereafter accruing. (Ex. 2–B.)

5. The same parcel of land which is the subject of the sale at issue in this case.

6. Appellant, when the lease was negotiated, had in his possession two cashier's checks in the amount of $25,000.00 and $35,000.00 respectively, and a third check for $50,000.00. He first offered the $25,-000.00 check without success. He then produced the $35,000.00 check, but when he got through negotiating with it, saw there was no purpose in bringing out the $50,000.00 check. The lease was then entered into.

7. The Boys' Market, Incorporated, had been incorporated in 1936, but had remained inactive until this transfer took place.

that it might be possible to purchase the land on which the corporation had built the San Gabriel market. According to appellant, the purchase would enable the corporation to secure a loan on the property and thus increase its working capital. Appellant and the secretary of the corporation were then authorized to "make such purchase, if the price was satisfactory, and to arrange a loan on terms and conditions they deemed proper considering our [the corporation's] loan agreement." [8]

During the taxable year in question, 1953, the corporation had issued and outstanding 5,500 shares of capital stock.[9]

The five brothers worked in various supervisory capacities in the business, with appellant as the principal executive officer and general manager. Appellant was the dominant figure in the corporation; he had control of its policies and made the executive and administrative decisions. The other stockholders and directors owed their livelihood to him. The brothers received salaries from the corporation and bonuses when profits justified them. During the year 1953 and on December 31, 1953, the corporation had accumulated earnings and profits and available cash in excess of $75,000.00 and maintained a "triple A" rating with Dun & Bradstreet. Nevertheless, it paid no regular dividends. Although it had net earnings for 1953, the corporation did not formally declare and pay a dividend during that year.

On April 28, 1953, at a meeting of the board held about four months after the meeting of January 27, 1953, the prior discussion about the possibility of purchasing the San Gabriel property was mentioned and the board then decided "that Joe [appellant] Goldstein and Lil-

8. The loan agreement referred to had been negotiated in 1950 by the corporation with Provident Mutual Life Insurance Company of Philadelphia. Under its terms the corporation borrowed $400,000.00 secured by a mortgage on all of its real estate and fixed property including the company office and the store in San Gabriel. The note agreement and mortgage contained certain restrictive covenants which, among other things, imposed some limitations on the corporation's borrowing and dividend activities.

9. Name

| Name | Number of shares |
|---|---|
| Joe Goldstein (appellant) | 2,720 |
| Joe & Lillian Goldstein as joint tenants | 150 |
| Lillian Goldstein as trustee for minor children | 36 |
| Edward Goldstein | 1,294 |
| Max Goldstein | 1,271 |
| Dorothy Goldstein (wife of Bernard, as trustee for her minor children) | 24 |
| Everett Eddy | 5 |
| Total | 5,500 |

The officers of the corporation were:

| | |
|---|---|
| Joe Goldstein (appellant) | President |
| Edward Goldstein | Vice President |
| Albert Goldstein | Vice President |
| Max Goldstein | Vice President |
| Everett Eddy | Secretary-Treasurer |
| Bernard Goldstein | Assistant Secretary-Treasurer |

The directors of the corporation were: Joe Goldstein, Lillian Goldstein, Max Goldstein, Edward Goldstein, Albert Goldstein, Bernard Goldstein, and Everett Eddy.

Max, Edward, and Bernard obtained their stock in the corporation by investing their bonuses in the business. Albert never owned any stock. Everett Eddy, first employed as bookkeeper for the business in 1936, acquired his shares of stock by gift from Max. Eddy kept the corporation's books and records and prepared minutes of the formal meetings of the directors, though when the brothers discussed matters together informally, minutes of such meetings were not always recorded.

lian Goldstein would buy this land as their private property, and they may at some time in the future, sell it to [the corporation]." The owner of the land (apparently to meet his own tax problems) had refused to accept cash for the San Gabriel property. He insisted upon an exchange for land and an apartment house in Las Vegas, worth $35,000.00. For various reasons,[10] the corporation declined to accept the exchange but as indicated above, deferred to appellant, and permitted him and his wife to negotiate with the owner of the San Gabriel property on their own behalf.

As a result of further negotiations with the owner of the land sometime before June 22, 1953, appellant entered into an agreement with the owner whereby appellant would buy a lot in Las Vegas, Nevada, where the owner of the property lived, and build an apartment house thereon for a total cost to appellant of $35,000.00, and upon completion of the construction appellant would trade the Las Vegas property to the owner for the San Gabriel property with no cash involved. Escrows to carry out this agreement were executed on June 22, 1953, and appellant put up $35,000.00 of his own money to carry it out. The transaction was completed on December 8, 1953, on which date appellant conveyed the Las Vegas property to the owner, and received in exchange a deed for the fee to the San Gabriel property, subject to the lease held by the corporation. The transaction was worked out in this way at the request of the owner of the San Gabriel property who had a tax basis of a little over $10,000.00 for said property.

On December 31, 1953, twenty-three days later, appellant and his wife conveyed the San Gabriel property to the corporation, by quit claim deed, for the sum of $75,000.00 in cash, thereby receiving $40,000.00 in excess of the cost to them of the property.

The appellant recognized the $40,000.00 profit as short-term capital gain which they offset against an unused capital loss carryover. (Ex. 1.) The appellee, however, determined that the profit was a disguised dividend, to be treated as ordinary income, and assessed the deficiency of $28,404.13. On the basis of the evidence presented to it, the Tax Court found as a fact that of the $75,000.00 received by appellant, only $35,000.00 was paid as consideration for the property; and that the remaining $40,000.00 was a dividend.

Appellant urges two errors:

1. The Tax Court erred in its determination of facts and the conclusions of law to be drawn therefrom.

2. The decision of the Tax Court is contrary to law.

The sole question presented in this case is whether the Tax Court erred in finding as a fact that the $40,000.00 profit realized by appellant on the sale of property to his family corporation three weeks after he had purchased it, is taxable as ordinary income in the form of a disguised dividend, instead of as a short term gain on the sale of a capital asset.

Appellant, in his opening brief, argues that the sale, as between appellant and the corporation, is neither void nor voidable, and could not be construed by

10. Appellant attempted to explain why the property was first acquired by him and then sold to the corporation, rather than being acquired directly by the corporation, by evidence to the effect that the owner would not sell the property for cash but would only trade it for investment property in Las Vegas; that the brothers, as directors, would not permit the corporation to enter into such a transaction because, by reason of their own personal unpleasant experiences in Las Vegas, they would have nothing to do with anything in Las Vegas; that it was against company policy to own the property on which its markets were located; that for some unexplained reason Eddy thought such a transaction might violate the corporation's loan agreement with Provident Mutual Life Insurance Company of Philadelphia; and that entering into this transaction might involve the corporation in interstate commerce which for some reason might affect the wages and hours of its employees.

the parties as representing payment of a dividend or a contribution to capital, nor anything other than a purchase and sale of real property. In support of this argument, appellant cites California authorities. Such authorities are beside the point. The findings and opinion of the Tax Court did not hold the sale to be void or voidable. And while state law is determinative of the nature of the interests created by a transaction, federal law controls the manner and extent to which these interests will be taxed.[11] Hence, though the transaction may (and here undoubtedly did) constitute a valid sale under California law, the incident of federal taxation is determined by federal law alone.

 Whether or not a corporation distributes a dividend or something else is a question of fact to be determined in each case.[12] No one factor is determinative of whether or not a corporate payment is a dividend or something else. The trier of fact must consider and weigh all the different facts involved before reaching its decision. And it is the function of this court on review merely to determine whether there is substantial evidence to support the findings of the Tax Court. Clark v. Commissioner, 9 Cir., 1959, 266 F.2d 698, 706. This court "must give due regard to the Tax Court's opportunity to base its determination in part on its own appraisal of the credibility of witnesses." Clark v. Commissioner, ibid. at 706.[13] It is well settled that

the findings of fact, and the inferences drawn from basic facts, by the Tax Court must be upheld unless clearly erroneous.[14]

 In view of the presumption of correctness which attaches to an assessment made by the Commissioner, and in view of the law which holds such assessments to be conclusive, unless clearly erroneous, when upheld by the Tax Court,[15] and particularly in view of the fact that there is substantial evidence in support of the Tax Court's decision here under review—this court affirms the decision below.

At the time of the purchase in December of 1953, the corporation had over forty-two years remaining on an extremely favorable lease under the terms of which the corporation was to pay but $800 rental per year plus incidental expenses and taxes (see marginal note 4, supra). All witnesses agreed that the lease was most favorable to the corporation. Nevertheless, though the corporation would pay less than $34,000 in rent over the remaining forty-two years of the lease, it decided to purchase the fee for $75,000. Equally revealing is the testimony of Everett Eddy that it was contrary to the corporation's policy to own real estate, and that subsequently to acquiring this property the corporation entered into a sale-lease-back arrangement with respect to it. If the corporation purchased the property to increase its loaning capacity, it is difficult to understand how this result could be accomplish-

11. Morgan v. Commissioner, 1940, 309 U.S. 78, 80, 60 S.Ct. 424, 84 L.Ed. 585, 1035; In re Sweet's Estate, 10 Cir., 1956, 234 F.2d 401, 404, cert. den. 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79; Pitts v. Hamrick, 4 Cir., 1955, 228 F.2d 486, 488.

12. Lengsfield v. Commissioner, 5 Cir., 1957, 241 F.2d 508, 510, and cases there cited.

13. It should be noted that the Tax Court, in the opinion here under review, stated: "Based on our examination of all of the evidence **and our observation of the witnesses** [emphasis ours] on the witness stand, * * *."

14. Commissioner v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.

Ed.2d 1218 ("Where the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' * * * The rule [Fed.R. Civ.P. 52(a)] itself applies also to factual inferences from undisputed facts * * *."); Weyl-Zuckerman & Co. v. Commissioner, 9 Cir., 1956, 232 F.2d 214, 216 ("We are of the opinion that the so-called inferences drawn from other facts were still findings of fact within the meaning of Rule 52(a), 28 U.S.C.A., as extended to cases from the Tax Court.")

15. Thomas v. Commissioner, 6 Cir., 1955, 223 F.2d 83; see also, Moreno's Estate v. Commissioner, 8 Cir., 1958, 260 F.2d 389.

ed with an intention to make, or after it had made, a sale-lease-back arrangement.

Not only did the corporation purchase property on which it had a long and favorable lease, but it also paid an unusual price to its controlling shareholders. It paid $75,000 only twenty-three days after appellant had purchased the property for $35,000. In addition to these circumstances, we find in the record the following testimony: Ray E. Torley (controlling shareholder of the property's former owner) testified that it is "impossible" to sell for $40,000 property subject to a fifty-year lease with an $800 per year rental (a two per cent net return); Everett Eddy, testified that the price (not more than $40,000) which the former owner was asking was too high; and appellant himself testified that he would not even consider retaining a $35,000 piece of property which returned only $800 per year as rental income. The Tax Court had substantial evidence to support its finding that the corporation paid only $35,000 to appellant as consideration for the property.

Appellant insists that he received from the corporation only the fair market value of the property. He points to the testimony of an independent appraiser who valued the property at $79,000, and Mr. Eddy's testimony that he received a figure of $75,000 from the Bank of America. However, we deem it significant that appellant neglects to explain the lack of any direct evidence that either of these valuations took the effect of the lease into consideration.

Appellant argues that there can be no taxable dividend without a corresponding reduction of the corporation's assets, and that there is no such reduction when the corporation buys property at a price based on its fair market value.

Fair market value is generally defined as that price which a willing buyer would pay to a willing seller after negotiations in which neither party was acting under compulsion.[16] Opinion evidence of the type presented in this case, is not binding.[17] Cost, however, is often considered persuasive (and frequently the best) evidence of fair market value.[18] The former owner of the property was reluctantly obliged to recognize that because of his unfavorable lease, the land could not be sold for $40,000; and that $35,000 was a reasonable price.

Not only did appellant sell property to a family corporation for a price in excess of what he paid for it only three weeks before, but he also sold it at a price in excess of what the most persuasive evidence shows was the fair market value. In view of the subsequent sale and lease-back, the only reasonable purpose for the purchase and sale to the corporation was the desire to secure a tax-free dividend. To gain this tax-free dividend, appellant resorted to a step transaction, with the first phase the securing of the property at the price ($35,000) the corporation would have paid, and with the second phase the sale to the corporation at a higher ($75,000) price. (This also allowed appellant to take advantage of a loss carryover.) The holding that the $40,000 represented a disguised dividend is fortified by appellant's testimony where he, in essence, admitted that his purchase of the property was only a stepping stone to the later sale to the corporation; appellant himself ridiculed the idea that he would retain a $35,000 piece of property paying only an $800 return, "which is approximately a two and three-quarters percent return [sic]."

With substantial evidence to support the Tax Court's holding that the fair market value of the property was $35,000,

16. Commissioner v. Marshman, 6 Cir., 1960, 279 F.2d 27, 32; In re William's Estate, 9 Cir., 1958, 256 F.2d 217, 218; Fitts' Estate v. Commissioner, 8 Cir., 1956, 237 F.2d 729, 731.

17. Sartor v. Arkansas Gas Corp., 1944, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.

Ed. 967; In re William's Estate, supra, 256 F.2d at 219.

18. Guggenheim v. Rasquin, 1941, 312 U.S. 245, 256, 61 S.Ct. 507, 85 L.Ed. 813; Duke v. Commissioner, 2 Cir., 1952, 200 F.2d 82, 84, cert. den. 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342.

the Tax Court cannot be said to have been clearly erroneous in holding that the corporation actually paid appellant $35,000 for the property. Nor is the Tax Court's holding that the payment over and above the fair market value was a disguised dividend clearly erroneous. The payment of $40,000 would reduce the corporation's assets in an amount corresponding with the dividend which the Tax Court held was paid to appellant by the corporation.

Appellant, here and in the Tax Court, places heavy reliance on Sun Properties v. United States, 5 Cir., 1955, 220 F.2d 171. In Sun Properties, the taxpayer brought an action in the district court for a refund of income taxes. The sole question there before the court was whether the district court had erred in holding that a conveyance of a heavily depreciated warehouse property to the taxpayer corporation by its sole stockholder, in form a sale, was in substance a contribution to capital. The fifth circuit there said:

> "[I]ts [the district court's] rationale is that this was not a customary or usual sort of sale nor the type which would have taken place between parties at arm's length; the decisive consideration motivating the transaction was the minimizing of taxes; and, in fact, that was the only business purpose of the transaction. Therefore, the [district] court reasoned, it was not a sale at all * * *. [220 F.2d at 173]

> \* \* \* \* \* \*

> "This rationale is perilously plausible. It is in effect saying to the taxpayer, 'You did this under suspicious circumstances; therefore, you did not do it at all, and you are not entitled to any tax advantages.' For all of the circumstances relied upon by the Government are consistent both logically and empirically, we think, with the opposite conclusion that the transaction was a sale in fact as well as in form; these are good reasons to scrutinize the transaction carefully, but they are not rational proof that it was something other than what it pur-

ported to be. [220 F.2d at 173–174.]

> \* \* \* \* \* \*

> "So, having scrutinized the transaction closely, as we were bound to do, we find not a particle of proof that it was in fact a contribution to capital nor that it was intended as such * * *" (220 F.2d at 175.)

To this argument, in the opinion here under review, the Tax Court said:

> "Sun Properties v. United States [supra] is heavily relied on by petitioners but is clearly distinguishable on the facts. The question there was whether the transfer of depreciable property to a wholly owned corporation was a sale or a contribution of capital. Here the question is whether a part of the sum paid by the corporation to the principal stockholder ostensibly as part of the purchase price of the land was in fact a disguised dividend. Accepting all the legal principles set forth in the Sun Properties case and applying those that are pertinent to the facts here would not, in our opinion, require a different conclusion than we have reached * * See Aqualane Shores, Inc. v. Commissioner, 269 F.2d 116 (C.A.5, 1959), affirming 30 T.C. 519, where the Court of Appeals for the Fifth Circuit distinguished its own Sun Properties case on the facts."

In the opinion here under review, the Tax Court did not hold adversely to appellant because the transaction was tax-motivated, or because it was not "at arm's length," or because it was not done in the usual manner. But because of these factors, the Tax Court (as did the fifth circuit in Sun Properties, supra) scrutinized the transaction. The distinction between the Sun Properties case, supra, and the case here under review is that, after scrutiny, there was here substantial proof that the transaction was a disguised dividend rather than the sale of a capital asset at its fair market value.

Affirmed.