JERRY S. LAUSMANN and DONNIS O. LAUSMANN, et al., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lausmann v. Commissioner
Docket Nos. 5201-76, 5212-76, 5225-76, 5273-76.
United States Tax Court
T.C. Memo 1978-420; 1978 Tax Ct. Memo LEXIS 97; 37 T.C.M. (CCH) 1740; T.C.M. (RIA) 78420; October 18, 1978, Filed Charles P. Duffy and Joyle C. Dahl, for the petitioners. Leo A. Reinikka, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Dkt. No.
Petitioner
TYE
Deficiency
5201-76
Jerry S. and Donnis
12/31/71
$ 18,065.00
O. Lausmann
12/31/72
24,343.24
12/31/73
4,893.15
12/31/74
562.05
5212-76
Kogap Lumber Industries,
3/31/71
45,836.47
Transferor, Kogap Lumber
3/31/72
114,155.31
Industries, Inc.,
3/31/73
144,073.34
Transferee
3/31/74
93,683.37
5225-76
Kogap Manufacturing Co.
3/31/69
44,093.88
3/31/72
86,394.79
3/31/73
128,744.10
3/31/74
99,380.96
5273-76
Anton A. Lausmann
12/31/71
15,586.18
12/31/72
2,075.38
12/31/73
10,161.32
12/31/74
4,989.55
*98 These cases were consolidated for purposes of trial, briefing, and opinion. Concessions having been made, the only remaining issues for decision are: (1) Whether Kogap Manufacturing Company is entitled to deduct the total amount of sales commissions paid by it to Kogap Lumber Industries during its taxable years ending March 31, 1972, March 31, 1973, and March 31, 1974, as ordinary and necessary business expenses under section 162(a). [2]
(2) Whether Kogap Lumber Industries received excessive passive investment income during its taxable year ending March 31, 1971, so as to terminate its election under section 1372 to be treated as a small business corporation. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Jerry S. and Donnis O. Lausmann and Anton A. Lausmann were all residents of Medford, Ore., at the time of filing their petitions herein. Petitioner Kogap Manufacturing Company (hereinafter KMC) and Kogap Lumber Industries (hereinafter KLI) were Oregon corporations which maintained their principal *99 offices in Medford, Ore., at all times relevant herein. [3]Both corporations filed tax returns on the basis of a fiscal year ending March 31 and computed their income under the accrual method. KMC was incorporated under the laws of Oregon in April 1954, and during the years in issue KMC was engaged in the business of manufacturing veneer, plywood, and other wood products. At all times material herein, KMC's voting stock was held by the following shareholders in the percentages shown: *100 Shareholder [4]
Ownership Percentage
Anton A. Lausmann
39.6
Estate of Grace S. Lausmann
10.6
Jerry S. Lausmann
32.4
S. V. McQueen
8.7
Carol A. Kennedy
8.7
Totals
100.0
KLI was incorporated on September 9, 1946, and at all relevant times KLI was engaged in the financing, merchandising, and sale of forest products. Its major activity was selling veneer, pulp, chips, peeler core, and bark produced by KMC. The capital stock of KLI consisted of 5,000 shares of stock without par value, all of which was owned by Anton A. Lausmann. On March 10, 1966, KLI elected to be taxed pursuant to the provisions of subchapter S of the Internal Revenue Code. On June 5, 1958, KMC and KLI entered into a written agreement whereby KLI agreed to sell the veneer and other wood products manufactured by KMC. Under the terms of the agreement, KLI was to receive a 3 percent sales commission on all net sales of veneer and other wood products produced by KMC and sold by KLI. In addition, the services performed by KLI pursuant to the 1958 agreement included *101 inventory control, price determination, market analysis, product promotion, daily contact with customers, developing orders, order acceptance, shipping arrangements, invoicing, carrying accounts receivable, collection, handling complaints and claims, and general sales correspondence. Prior to 1964 KMC began producing large quantities of veneer used to make plywood, including Douglas Fir veneer and White Fir veneer. However, White Fir veneer was not widely accepted in the building industry, making it much more difficult to sell than Douglas Fir veneer. To facilitate the sale of the White Fir veneer manufactured by KMC, in 1964 KLI entered into an agreement with another sales company, Alpine Veneers, Inc. (hereinafter Alpine), whereby Alpine agreed to purchase the White Fir veneer from KLI and resell it to its customers. [5] Since Alpine possessed expertise in selling veneer and had a much larger sales organization and customers in more places than did KLI, KLI was able to increase its sales of White Fir veneer through its agreement with Alpine without spending large sums to expand its own sales force. However, the services *102 of Alpine in helping KLI to sell the White Fir veneer did not diminish the need for KLI's services to KMC with respect to the sales of this veneer. KLI's sales department spent 95 percent of its time on White Fir veneer sales and only 5 percent of its time on Douglas Fir veneer sales. Selling the Douglas Fir veneer simply required a phone call to each customer once a week to determine how much of the veneer he would be needing. For these efforts KLI received a 3 percent commission. Selling the White Fir veneer, on the other hand, was a daily problem. Lengthy negotiations between KLI and Alpine were often necessary to reach agreement on the thickness and quantity of the White Fir veneer to be delivered to the ultimate customer. Moreover, KLI was responsible for shipping, billing, and carrying the accounts receivable on the White Fir veneer sales as well as Douglas Fir veneer sales. Shipping arrangements were much more complex and time consuming on White Fir veneer sales because it had to be shipped by railroad car to the customer. Douglas Fir veneer, on the other hand, was picked up at the mill by the purchaser using his own trucks. In accordance with the agreement between *103 KLI and Alpine, when Alpine would make a sale of White Fir veneer to one of its customers, it would remit the sales price, less a 3 percent commission to KLI.KLI, under its agreement with KMC, was entitled to a 3 percent commission on all net sales of veneer. [6] Consequently, the amount ultimately received by KMC on sales made through Alpine was reduced by both Alpine's 3 percent commission as well as KLI's 3 percent commission. During the years in issue, KMC paid the following commissions to KLI and Alpine on White Fir veneer sales: FYE
Paid to KLI
Paid to Alpine [7]
Totals
March 31, 1971
$ 55,717.38
$ 58,649.88
$ 114,367.26
March 31, 1972
117,223.07
123,392.71
240,615.78
March 31, 1973
147,420.15
155,179.11
302,599.26
March 31, 1974
102,970.22
108,389.70
211,359.92
As previously mentioned, White Fir veneer was not widely accepted *104 in the building industry. One of the reasons for this was its water content was higher than that of Douglas Fir veneer. Thus, shipping the White Fir veneer wet cost more because it weighed more. To overcome this problem and increase its sales of White Fir veneer, in 1965 KMC decided to install a veneer dryer at its plant site. However, KMC lacked the finances necessary to purchase and install a dryer. KMC rejected a proposal by an unrelated plywood company because it did not want an unrelated party to own a facility located on its property. Thereafter, KLI agreed to construct and operate such a dryer for KMC's use. In accordance with this agreement, the dryer was built and placed into operation in February 1966. Subsequently, KMC and KLI entered into an agreement under which KMC agreed to pay KLI $ 6.00 per thousand board feet 3/8" for veneer drying. In addition, under this agreement KMC was to pay KLI a yearly minimum fee for veneer drying. This fee was unrelated to the volume of veneer dried. To take advantage of the efficiencies inherent in the pooling of labor and to simplify purchasing, KLI entered into a contract with KMC, whereby KMC agreed to provide the labor and supplies *105 for the operation of the dryer facility. Pursuant to this agreement some of KMC's employees were used in connection with the operation of the dryer. The foreman of the drying operation, however, was directly employed by and responsible to KLI. [8] He was in charge of the entire operation and all of KMC's employees assigned to the dryer were under his supervision. The activities directed by the foreman included placement of the veneer into the dryer, control and maintenance of the dryer itself, removal of the veneer from the dryer, as well as counting, grading and packaging the dried sheets of veneer. During the years in issue, KMC paid to KLI the following veneer drying charges: FYE
Amount
March 31, 1971
$ 192,910.37
March 31, 1972
408,263.20
March 31, 1973
425,564.08
In April 1973 KLI sold the dryer facility to KMC. In the statutory notice of deficiency sent to KMC respondent determined that the commissions paid to KLI on sales of White Fir veneer *106 made through Alpine were excessive and therefore not ordinary and necessary under section 162 except to the extent of 1/2 of 1 percent of net sales. In the statutory notice of deficiency sent to KLI respondent determined that KLI's election under section 1372(a) to be treated as a small business corporation was terminated for the taxable year ending March 31, 1971, because it had passive investment income in excess of 20 percent of its gross receipts. OPINION The first issue for decision is whether KMC is entitled to deduct the total amount of sales commissions paid by it to KLI during its taxable years ending March 31, 1972, March 31, 1973, and Marck 31, 1974, as ordinary and necessary business expenses under section 162(a). The determination of whether or not a payment constitutes an ordinary and necessary business expense is primarily a question of fact. Commissioner v. Heiniger, 320 U.S. 467, 475 (1943). In this connection we recognize that in the present case KMC and KLI were related parties and, therfore, the commissions KMC paid to KLI must be closely scrutinized to ensure that they were what they purported to be and that they were reasonable in amount. *107 B. Forman Co. v. Commissioner,453 F.2d 1144, 1160 (2d Cir. 1972), cert. denied 407 U.S. 934 (1972); Goldstein v. Commissioner, 298 F.2d 562, 568 (9th Cir. 1962); Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953). Respondent contends that no bona fide business purpose can be found for KMC's payment of a 3 percent commission to KLI on sales through Alpine. On the sales, according to respondent, KLI was merely recording the sale, preparing the veneer for shipment, and carrying KMC's accounts receivable for approximately 15 days. Hence, respondent concludes, these minimal efforts warranted a commission of no more than 1/2 of 1 percent of net sales. We would be inclined to agree with respondent if his simplistic view of the facts represented an accurate description of the services actually performed by KLI. However, in view of the facts presented, we believe KLI performed services sufficient to justify a 3 percent commission. [9]
*108 Due to customer resistance, White Fir veneer was a "hard sell." Because of this, KLI enlisted the services of Alpine, a company with an extensive sales organization and expertise in selling veneer, to assist it in marketing this product. While Alpine played an instrumental role in selling the White Fir veneer, KLI also performed substantial services in this sales process. Charles Heffner, KLI's sales manager, testified that KLI's sales department spent 95 percent of its time on White Fir veneer sales and only 5 percent of its time on Douglas Fir veneer sales.Selling the Douglas Fir veneer simply required a phone call to each customer once a week to determine how much of the veneer he would be needing. Selling the White Fir veneer, on the other hand, was a daily problem. Lengthy negotiations between KLI and Alpine were often necessary to reach agreement on the thickness and quantity of the White Fir veneer to be delivered to the ultimate customer. Moreover, KLI was responsible for shipping, billing, and carrying the accounts receivable on the White Fir veneer sales as well as Douglas Fir veneer sales. Shipping arrangements were much more complex and time consuming on White *109 Fir veneer sales because it had to be shipped by railroad car to the customer. Douglas Fir veneer, on the other hand, was picked up at the mill by the purchaser using his own trucks. Furthermore, we note that the record indicates that respondent has not challenged KMC's deduction of the 3 percent commissions paid to KLI for its sales of Douglas Fir Veneer. Yet, as can be seen from the above, KLI did as mdch work or more on its sales of White Fir veneer as it did on its sales of Douglas Fir veneer. Considered in this light, we believe the 3 percent commissions KMC paid to KLI on the sale of White Fir veneer were most reasonable. [10]
Accordingly, we hold that KMC is entitled to deduct the full amount of commissions paid to KLI on the sales of White Fir veneer. The second issue for decision is whether KLI received excessive passive investment income during its taxable year ending March 31, 1971, so as to terminate its election under section 1372 to be treated as a small business *110 corporation. The provisions of subchapter S were intended by Congress to be made available to small corporations "actively engaged in trades or businesses"; a corporation producing substantial amounts of "passive investment income" is not entitled to be treated as a small business corporation. [11] Thus, section 1372(e)(5) provides that an election under subchapter S will terminate if the electing corporation has "passive investment income" in excess of 20 percent of its gross receipts. [12] Moreover, section 1372(e)(5)(C) specifically includes "rents" as one variety of "passive investment income." Under regulation section 1.1372-4(b)(5)(vi) the term "rents" as used in section 1372(e)(5) means amounts received for the use of or right to use property (whether real or personal) of the corporation. However, this same section of the regulations also provides that amounts received for the use of property will not constitute "rents" within the purview of section 1372(e)(5) if "significant services" are rendered in connection with the amounts received. *111 The parties appear to agree the amounts KMC paid KLI for veneer drying were "rents" within the meaning of the regulations. [13] They have also stipulated that "significant services" were rendered in connection with the operation of the dryer. Therefore, the only remaining question is who performed the significant services. If KLI performed the services, then pursuant to regulation section 1.1372-4(b)(5)(vi) the rental income it received is not passive investment income. If KMC performed the services, then the rental income KLI received is passive investment income. Respondent contends that the significant services were performed by employees of MKC and, hence by KMC. Petitioner, KLI, on the other hand, contends that the dryer foreman was its employee and his activities in connection with supervising the drying operation constituted significant services. Therefore, KLI rendered the *112 significant services. We agree with petitioner. In the present case we do not believe, as respondent asserts, that because KMC's employees operated the dryer, the inquiry as to who rendered the significant services is ended. On the contrary, we consider the role of the dryer foreman to be the decisive factor in our resolution of this issue.
Based on the testimony of KLI's sales manager, Charles Heffner, and KLI's vice-president, S. V. McQueen, we find that the dryer foreman was directly employed by and responsible to KLI. [14] The foreman was in charge of the entire drying operation. All of KMC's employees assigned to the dryer were under his supervision. The activities directed by the foreman included placement of the veneer into the dryer, control and maintenance of the dryer itself, removal of the veneer from the dryer, as well as counting, granding and packaging the dried sheets of veneer. Considering the activities performed by KLI's dryer *113 foreman, we conclude that KLI rendered significant services in connection with the operation of the drying facility. Accordingly, because we have found that KLI rendered significant services, the amounts it received from KMC for veneer drying were not passive investment income within the meaning of section 1372(e)(5)(C). From a review of all the facts, we find that KLI's passive investment income for its taxable year ending March 31, 1971, did not exceed 20 percent of its gross receipts and, therefore, KLI's election to be treated as a small business coproration was not terminated for such taxable year. [15]
Decisions will be entered under Rule 155. Footnotes
2. All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.↩
3. On April 1, 1974, KLI merged into Continental Timber Company and thereafter Continental Timber Company was renamed Kogap Lumber Industries, Inc. On September 18, 1975, Kogap Lumber Industries, Inc. executed an agreement with respondent in which Kogap Lumber Industries, Inc., as transferee of the assets of KLI, assumed and agreed to pay the amounts of any and all Federal income or profits taxes determined to be due from K@LI for taxable years ended March 31, 1971, March 31, 1972, March 31, 1973, and March 31, 1974, to the extent of the liability at law or in equity as transferee within the meaning of sec. 6901. Thus, Kogap Lumber Industries, Inc. became the transferee-petitioner herein.↩
4. Grace S. Lausmann was the wife of Anton A. Lausmann, and Jerry S. Lausmann and Carol A. Kennedy are his children.↩
5. Alpine Veneers, Inc. was not related to KMC or KLI.↩
6. In the 1958 agreement between KMC and KLI, "net sales" was defined as the net amount received by KLI after deduction of freight, other usual sales commissions, and discounts.↩
7. These amounts are taken from the explanation of items attached to respondent's statutory notice of deficiency sent to KMC.↩
8. Stan Murrey was the dryer foreman during the taxable years ending March 31, u971, and March 31, 1972. He was replaced by J. Lowder who was the foreman during the taxable year ending March 31, 1973.↩
9. One possible reason for respondent's erroneous determination is that the auditing agent apparently did not discuss the sales of White Fir veneer through Alpine with KLI's sales manager, Charles Heffner.↩
10. See Magnolia Lumber Corp. v. Commissioner, T.C. Memo. 1962-224↩, in which we permitted a lumber company to deduct a 6-3/4 percent sales commission paid to a related sales company.
11. H. Rept. 1238, 89th Cong., 2d Sess. (1966); S. Rept. 1007, 89th Cong., 2d Sess. (1966), 1966-1 C.B. 527↩, 532. 12. Sec. 1372(e)(5). Passive Investment Income.-- (A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation. * * *
(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities * * *.↩
13. Since the record shows that the amounts KLI received from KMC for veneer drying far exceeded KLI's original investment in the dryer, we question whether these amounts constituted rent. Nevertheless, in this opinion we will assume, as apparently do the parties, that these amounts were rent.↩
14. We also note that in the statutory notice sent to KMC respondent treated the dryer foreman as a 100 percent employee of KLI and therefore disallowed KMC's deduction for contributions to its profit-sharing trust on his behalf.↩
15. Due to our disposition of this issue we need not consider petitioner's alternative argument.↩