DONALD W. WEBER AND JANE WEBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weber v. Commissioner
Docket No. 14685-91
United States Tax Court
T.C. Memo 1994-307; 1994 Tax Ct. Memo LEXIS 310; 68 T.C.M. (CCH) 11; July 5, 1994, Filed *310 Decision will be entered under Rule 155. For petitioners: Kenneth J. Freeman. For respondent: John E. Budde. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Section
Section
Section
Section
Year
Deficiencies
6653(b)(1)
6653(b)(2)
6659
6661(a)
1982
$ 9,323
$ 4,662
[1]
-0-
$ 2,331
1983
8,306
4,153
[2]
-0-
2,077
1984
28,419
14,210
[3]
$ 306
6,341
1985
17,883
8,942
[4]
4,471
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by the parties, [1] the following issues are to be decided by the Court: 1. Whether certain additional items should be included in computing petitioners' net worth; 2. Whether petitioner Donald R. Weber is liable for the *311 additions to tax for fraud for the taxable years 1982, 1983, 1984, and 1985 under section 6653(b)(1) and (2); 3. Whether petitioners are liable for the addition to tax for a substantial understatement of tax under section 6661(a) for each of the years at issue; and 4. Whether the statute of limitations bars the assessment of the admitted tax deficiency for the taxable year 1982. *312 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. General Background
Petitioners Donald W. Weber and Jane Weber resided in Avon Lake, Ohio, at the time they filed the petition in this case. Petitioners were married and filed joint returns for each of the years at issue. The term petitioner in the singular will hereinafter refer to petitioner Donald W. Weber. Petitioner was graduated from Baldwin-Wallace College in 1961, receiving a bachelors degree in business administration. In 1967 and 1968, petitioner took graduate level courses in business at Western Michigan University. Petitioner was the machining and fabrication buyer for the Eaton Corporation during the years 1966 through 1975 and for the Republic Steel Corporation (Republic) and its successor, LTV Steel Company (LTV), during the years 1975 through 1986. Hereinafter petitioner's employer for the years before the Court will be referred to as LTV. Throughout his employment with LTV, petitioner was responsible for awarding contracts to various suppliers who performed machining and fabricating *313 services for LTV. [2]LTV used a bid system to award contracts to the supplier who submitted the lowest bid conforming to the job specifications. A few of the jobs were awarded through a sealed bid process; however, in most instances, the bids were not sealed. LTV maintained a "bidders list" of suppliers. Petitioner solicited bids from LTV suppliers on the bidders list. Suppliers had to go through petitioner in order to be placed on the bidders list. Petitioner had authority to award contracts of up to $ 100,000 on his own. Scheme to Defraud
Petitioner and various suppliers devised a scheme to defraud LTV. Representatives of certain suppliers agreed to pay petitioner money or provide him nonmonetary benefits in exchange for his assistance in obtaining contracts with LTV at favorable prices. Suppliers participating in the scheme *314 either submitted formal written bids to petitioner or made informal oral bids by telephone. After the deadline for submitting bids had passed, if the supplier submitting the lowest bid was a participant in the fraud scheme, petitioner would notify that supplier that it could increase its bid by a stated amount. Then the supplier would submit a new bid at the higher price. On some occasions, if another (nonparticipating) supplier submitted the lowest bid, petitioner would inform a supplier participating in the scheme of the lowest bid and allow that participant to make an even lower bid. In either instance, the participant's bid would ultimately be the lowest bid submitted; thus, the participant's bid would be accepted, and the participant would be awarded the contract with LTV. Suppliers awarded contracts in this fashion paid petitioner 50 percent of the amounts by which they had increased their bids or paid him in goods or services. The suppliers paid kickbacks to petitioner in money, property, and services. Petitioner set up a dummy company, Ja-Don Co. (Ja-Don), to conceal from LTV the illegal kickbacks he received from LTV's suppliers. Ja-Don did not conduct any business *315 or incur any expenses. [3] Petitioner prepared fictitious invoices for LTV suppliers, which purported to reflect services, such as grinding shafts, performed by Ja-Don. Neither Ja-Don nor petitioner performed the services indicated on the invoices sent to LTV suppliers. Petitioner used a post office box to receive checks made payable to Ja-Don. Kickbacks to Petitioner
Metalkrafters International, Inc. (Metalkrafters), Jerpbak-Bayless Mechanical Services Co. (Jerpbak-Bayless), Tenk Machine and Tool, Inc. (Tenk), Minnotte Manufacturing, Specialty Steel, Inc. (Specialty Steel), Tiger Industries, and U.S. Welding, a subsidiary of Tiger Industries, were among the LTV suppliers that paid kickbacks, in cash or benefits, to petitioner. During 1982, Metalkrafters and Jerpbak-Bayless paid kickbacks to petitioner. Metalkrafters paid *316 petitioner $ 9,710 and issued him a Form 1099 for 1982 reflecting that amount. Petitioner deposited the cash kickbacks from Metalkrafters into a savings account at Ameritrust Bank that he opened on April 9, 1981, in the names of petitioner and his son, Eric Weber. During 1982, Metalkrafters also arranged a trip to Las Vegas for some of the buyers with whom it was dealing, including petitioner. Metalkrafters paid a total of $ 829 for airfare and hotel accommodations for petitioner and his wife for the Las Vegas trip. [4]Jerpbak-Bayless paid petitioner $ 19,339.65 during 1982 and did not issue him a Form 1099. Petitioner did not inform his accountant about the $ 19,339.65 that he had received from Jerpbak-Bayless or the Las Vegas trip provided by Metalkrafters during 1982. Petitioner did not report the income from Jerpbak-Bayless or the value of the Las Vegas trip on the 1982 Federal income tax return. During 1983, Tenk paid petitioner $ 1,000 in cash, and U.S. Welding *317 made a payment in the amount of $ 1,000 to Venetian Marina for petitioner's benefit. On February 13, 1984, U.S. Welding and Tiger Industries each paid petitioner's son, Eric Weber, $ 692.50. Eric did not perform any services for U.S. Welding or Tiger Industries. After Eric endorsed each check, petitioner endorsed and cashed the checks. During November and December of 1984, U.S. Welding and Tiger Industries also made payments totaling $ 2,910 to McNeely Construction for petitioner's benefit. During 1985, Metalkrafters paid petitioner $ 6,000 in cash, Tenk paid petitioner at least $ 1,000 in cash, and U.S. Welding paid $ 950 to 84 Lumber for petitioner's benefit. During 1985, Specialty Steel or its parent company, Rochez Brothers Company, helped petitioner construct a breakwall on his lakefront property. [5] Specialty Steel was a supplier of LTV, and petitioner represented LTV in contract negotiations with Specialty Steel. During that year, petitioner had visited Specialty Steel's facility located in Pittsburgh, Pennsylvania. This visit was petitioner's only visit to the Specialty Steel facility. Subsequently, Specialty Steel delivered 60 to 70 concrete blocks to petitioner's *318 residence in Avon Lake, Ohio. Specialty Steel delivered the concrete blocks on a truck and trailer that had a maximum capacity of five blocks. [6] Specialty Steel also delivered a self-propelled 18-foot crane to petitioner's residence to unload and place the concrete blocks. The crane remained there for over 2 months. Using the crane, Specialty Steel employees put the concrete blocks in place to form the breakwall. Later, petitioner and his son, John Weber, secured the blocks with cable and obtained backfill to support the wall. Petitioner did not pay Specialty Steel (or its parent company) for the materials or the labor associated with construction of the breakwall. During the years at issue, in addition *319 to cash, Tenk provided a subcontractor to do some drywall and electrical work on petitioner's home, purchased a ring for petitioner's wife, and furnished petitioner a riding lawn mower. [7] The owner of Tenk provided these benefits to petitioner because petitioner controlled the bidding for LTV supply contracts. Tenk (and its owner) stopped providing these benefits to petitioner after petitioner left LTV. In addition, petitioner purchased two cars from an LTV supplier during the years at issue. On April 9, 1983, petitioner purchased a 1981 Buick Electra sedan (the 1981 Buick) from Minnotte Manufacturing for $ 4,000. On September 28, 1984, petitioner purchased a 1983 Buick Electra sedan (the 1983 Buick) from Minnotte Manufacturing for $ 6,000. As of the dates of purchase, the Red Book National Market Reports and the NADA Used Car Guide valued the 1981 Buick at $ 8,850 and $ 9,375, respectively, *320 and valued the 1983 Buick at $ 13,950 and $ 12,000, respectively. Petitioner owned and used the 1981 and 1983 Buicks from their dates of purchase through 1985. On April 24, 1986, petitioner sold the 1983 Buick to an unrelated third party for $ 7,7800, some $ 1,800 more than he originally paid for it. Petitioner did not report the gain on the sale of the 1983 Buick on his 1986 tax return. Pacific Gas and Electric Stock
Anna Gruninger, a close family friend, died in September of 1984, leaving her entire estate to petitioner's father, Sam Weber. Petitioner's father disclaimed his interest in the Gruninger estate, and, as a result, the entire estate passed to petitioner. Among the assets of the estate were 1,000 shares of Pacific Gas and Electric (PG&E) common stock that the estate valued at $ 10,240 as of the date of death. On February 20, 1985, petitioner acknowledged in writing receipt of complete distribution of his share of the estate. On March 28, 1985, petitioner requested in writing that the personal representative of the estate not transfer title of the 1,000 shares of PG&E stock to him. Instead, petitioner directed the personal representative to sell the stock *321 and send him a check for the full amount received on the sale. Petitioner received a check in the amount of $ 17,974.77 in April of 1985. Petitioners' Tax Returns
Prior to 1982, petitioner prepared the couple's tax returns himself. In 1982, petitioner decided to seek the assistance of an accountant. He was referred to Phil Parhamovich (Parhamovich). Petitioner told Parhamovich that he (petitioner) was operating a Schedule C business out of his home, the activities of which included the machining and sales of parts. [8] Parhamovich asked petitioner and his wife to fill out a questionnaire, listing income, expenses, and categories of expenses for themselves and for Ja-Don. Petitioner provided Parhamovich the name, description, and gross receipts of the business. Petitioner did not tell Parhamovich about the $ 19,339.65 that he had received from Jerpbak-Bayless in 1982 nor was this amount reported on the 1982 return. Parhamovich did not see or request to see receipts or bank statements to verify any items that petitioner wanted to claim on the return, although Parhamovich advised petitioner to retain receipts in case of audit. Parhamovich merely reviewed the information *322 provided to see if anything appeared "out of line" and prepared the return with a Schedule C for Ja-Don. Petitioners filed their 1982 Federal income tax return on or before April 15, 1983. Parhamovich provided petitioner and his wife with an income tax worksheet for the 1983 taxable year and income tax systemizers for the 1984 and 1985 taxable years. Petitioner completed the worksheet and systemizers. Petitioner did not tell Parhamovich that he had received cash, property, or other benefits from the suppliers and did not report the receipt of such cash, property, or benefits on his returns for the years at *323 issue. Petitioner told Parhamovich that he had a business office in his home, that he used his vehicle in his Schedule C business, and that his children performed services for the business. The services performed by the children were household chores, a fact that petitioner did not tell Parhamovich. These minor children were not employed outside the home during the years at issue. Petitioner claimed deductions for the business use of a portion of his house and car, utilities, wages paid to his minor children, and entertainment expenses. None of these claimed business expenses was in fact incurred. Petitioners' 1982, 1983, 1984, and 1985 tax returns contain errors. Each of those returns omitted some amounts of taxable income. Petitioners failed to report income on their returns. Petitioners claimed deductions on their tax returns to which they were not entitled. Petitioners repeatedly have made the same types of errors on each of their 1982, 1983, 1984, and 1985 returns. Criminal Investigation of Petitioner's Kickback Activity
In September of 1986, LTV security personnel began an investigation of petitioner's activities. Initially, petitioner denied any involvement *324 in a kickback scheme, but he later admitted that some of his behavior had been "unethical". After LTV security personnel discovered that petitioner had purchased vehicles from Minnotte Manufacturing, they again confronted petitioner. Petitioner claimed that he had paid full market value for the cars but that the titles reflected lower prices to reduce the sales tax he had to pay on the purchases. Petitioner had not in fact paid full market value for the cars. The LTV investigator also questioned petitioner about Ja-Don. Petitioner told the investigator that, because the steel industry was not doing well, he had set up Ja-Don as a separate company in order to conduct his own business separate from LTV's. Petitioner did not have any business separate from his employment with LTV and the fraud and kickback scheme. Petitioner then admitted to the LTV investigator that he had received money from some LTV suppliers. However, petitioner did not disclose all of the names of the suppliers involved. During the investigation by LTV, petitioner called one of the suppliers and asked him to tell LTV investigators that he was performing consulting and engineering services for the supplier. *325 When the Internal Revenue Service (IRS) began its investigation, petitioner made a similar request to the supplier. In early 1987, the Criminal Investigation Division of the IRS began investigating petitioner and his kickback scheme. During a series of interviews, petitioner made inconsistent statements to IRS agents regarding the sources of his income, the amount of cash on hand, his method of accounting for and reporting income for the Schedule C business, and vacations provided by LTV suppliers. During the initial interview, the agents asked petitioner about the source of income to Ja-Don that was reported on the Schedule C. The agents questioned the statement on the return that the income was from the sale of machine parts. Petitioner first said that the income came from engineering services. In a later interview, the agents told petitioner that they had information that he had received kickbacks. Petitioner objected to the term kickbacks, and claimed that the income was consideration for assisting the suppliers' salesmen in the preparation of bids. Initially, petitioner told the IRS agents that he had a minimal amount of cash on hand, but later agreed that the correct *326 amount was $ 3,500. [9] He told the agents that he reported his Schedule C business income in an amount equal to the Schedule C bank account deposits. The agents later determined that the reported Schedule C business income did not equal the Schedule C bank account deposits. Petitioner initially denied but later admitted that an LTV supplier had paid for a vacation. After an IRS agent asked petitioner Jane Weber (Mrs. Weber) about the breakwall, Mrs. Weber told the agent that her husband had handled the matter, but that, to the best of her knowledge, they had paid a contractor in cash and by check to construct the breakwall. The agent was unable to verify petitioners' payment *327 for the breakwall in the records supplied by petitioners. The agent contacted Rochez Brothers and was told that the supplier had provided the materials and labor necessary to construct the breakwall without charge. When the agent later confronted petitioner with that information, petitioner confirmed that the LTV supplier had provided, without any charge to him, the materials and labor for constructing the breakwall. Petitioner, however, told the agent that he did not believe the supplier's actions were related to his position at LTV. At the trial in this case, petitioner admitted that he "hedged" and "flip-flopped" when he made statements to the IRS agents. Petitioner was indicted for filing false tax returns for the years 1983 through 1985 under section 7206(1) and for four counts of mail fraud under 18 U.S.C. section 1341 (1988). Petitioner pleaded guilty to filing a false return for the year 1985 and to one count of mail fraud. Specifically, the tax charge to which petitioner pleaded guilty was that: [as he] well knew and believed, the said return (1) reported that the defendant had a sole proprietorship under the name Ja-Don Co. *328 engaged in the business of selling machined parts, whereas the defendant did not have a sole proprietorship engaged in such business, (2) claimed deductions of approximately $ 13,331 with respect to said sole proprietorship, which said deductions the defendant was not entitled to claim, and (3) failed to report additional income received by the defendant of approximately $ 25,150 for that calendar year.
Petitioner was sentenced to 5-years probation. As a condition of the probation, petitioner was ordered to make restitution to LTV and to the IRS. He was required to pay LTV $ 5,000 in 1990, $ 5,000 in 1991, and $ 100 per month in 1992, and to pay the IRS $ 15,000 in 1990, $ 5,000 in 1991, and $ 100 per month in 1992. The probation department was to clarify any disputed amounts. Reconstruction of Petitioners' Income
Respondent utilized the net worth method to determine petitioners' taxable income for the taxable years at issue. Petitioners contend that certain assets (cash in certain bank accounts, the automobiles, and the breakwall) should be excluded from this computation. The parties agree that petitioners' net worth and unreported income for the years at issue, *329 with respect to the agreed items, are as summarized below: NET WORTH COMPUTATION
12/31/82
12/31/83
12/31/84
12/31/85
ASSETS
Cash on hand
$ 3,500
$ 3,500
$ 3,500
$ 3,500
Bank balances
63,776
73,162
83,176
66,302
Personal property
12,910
10,390
17,134
18,649
Real property
90,000
90,000
148,254
148,254
Capital account balances
11,318
11,621
16,671
94,972
Other assets
452
15,733
2,800
6,600
Total assets
$ 181,956
$ 204,406
$ 271,535
$ 338,277
LIABILITIES
Total loans and mortgages
36,677
34,611
80,989
77,611
NET WORTH
$ 145,279
$ 169,795
$ 190,546
$ 260,666
UNREPORTED INCOME COMPUTATION
End of year net worth
$ 169,795
$ 190,546
$ 260,666
Beginning of year net worth
145,279
169,795
190,546
Change in net worth
$ 24,516
$ 20,751
$ 70,120
Plus personal living expenses
41,315
96,117
82,560
Less nontaxable amounts
(10,366)
(4,805)
(77,518)
Adjusted gross income
$ 55,465
$ 112,063
$ 75,162
Adjusted gross income
41,341
62,512
52,459
per returns
UNREPORTED INCOME
$ 14,124
$ 49,551
$ 22,703
These agreed amounts do not include balances contained in certain bank accounts (the National City Bank accounts) *330 during the years at issue. On December 31, 1982, National City Bank accounts number XXXXXX3309 and number XXXXXX3202 each had a balance of $ 10,000. Both accounts were opened on August 13, 1982, at which time $ 10,000 was deposited into each account. The record does not disclose in whose name the accounts were titled or who had signatory authority on those accounts. On February 15, 1983, the accounts were closed, and the balances in the accounts were deposited into National City Bank account number XXXXXX6603, an insured money market account (the money market account). The names and signatures of Tim Weber, petitioner, and Sam Weber, petitioner's father, appear in that order on the signature card for the money market account. On September 15, 1983, $ 20,142.63 was withdrawn from the money market account and deposited into a second money market account number XXXXXX2702 (the last account). The names of Tim Weber and petitioner appear in that order on the signature card for the last account. The signature card also indicates that the last account was closed in 1986. If the balances in the last account are to be included in petitioners' net worth, the account should reflect *331 the following balances: 12/31/83
$ 20,591.12
12/31/84
22,862.23
12/31/85
25,376.62
The agreed amounts for computing petitioners' net worth also do not include the value of the 1981 and 1983 Buicks. In computing petitioners' net worth in the notice of deficiency, respondent valued the 1981 Buick at $ 8,850 and valued the 1983 Buick at $ 12,000. The agreed amounts for the net worth computation also do not include the value of the breakwall. The computation of unreported income includes $ 10,240 attributable to the 1,000 shares of PG&E stock in the deduction for "nontaxable amounts". OPINION I. Reconstruction of Petitioners' Income
Respondent has determined petitioners' taxable income for 1983 through 1985 based upon the net worth method of proof. The parties have stipulated to the greater part of petitioners' net worth for the years at issue. The Court must decide whether the following assets are to be included in petitioners' net worth: (1) National City Bank account; (2) the 1981 and the 1983 Buick automobiles; and (3) the breakwall. The Court must also decide what portion of the proceeds from the sale of the PG&E stock from the estate of Anna Gruninger is *332 nontaxable. Petitioners bear the burden of proving that respondent's determination of unreported income was incorrect. Rule 142(a); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978); Zarnow v. Commissioner, 48 T.C. 213, 216 (1967). A. National City Bank Account
Respondent has determined that the following balances contained in National City Bank account number XXXXXX2702 are to be included in petitioners' net worth: Year
Account Balance
12/31/83
$ 20,591.12
12/31/84
22,862.23
12/31/85
25,376.62
Petitioner contends that the funds in the National City Bank account belonged to his son, Tim Weber, and, therefore, should be excluded from the computation of the net worth. Petitioner contends that those funds represent a gift from petitioner's father to Tim. However, petitioner has not presented sufficient evidence to demonstrate that to be the case. Tim testified that "as far as I know they [the funds in the account] came from my grandfather". Tim could not recall whether or not he closed the account in 1986. He was in the eighth grade at the time. The Court finds it inherently incredible that a *333 child of that age would not remember if he had in fact closed an account having a balance exceeding $ 25,000. The National City Bank account was a joint account, with petitioner and Tim Weber as co-signatories. Although these funds subsequently may have been used to finance Tim's college education, these funds remained under petitioner's control during the years at issue and for some period of time thereafter. No evidence was presented that Tim had control over the funds during that time. Therefore, petitioners have not met their burden of proving that these funds should not be included in a calculation of their net worth. B. Automobiles
The parties also dispute the value of the 1981 and 1983 Buicks for computing petitioners' net worth. Petitioner argues that the prices he paid for the vehicles, $ 4,000 for the 1981 Buick and $ 6,000 for the 1983 Buick, are the proper values. As of the dates of purchase, the Red Book National Market Reports and the NADA Used Car Guide valued the 1981 Buick at $ 8,850 and $ 9,375, respectively, and valued the 1983 Buick at $ 13,950 and $ 12,000, respectively. In computing petitioners' net worth in the notice of deficiency, respondent *334 valued the 1981 Buick at $ 8,850 and valued the 1983 Buick at $ 12,000. Respondent contends that petitioners' net worth should be increased to reflect those values. We agree and sustain respondent's determination. It has been clearly shown that petitioner's purchase of these automobiles from Minnotte Manufacturing was not made in an arm's-length transaction. Petitioner was able to make these purchases at less than fair market value due to his position at LTV. He admitted that he purchased the 1983 Buick at "a reduced price". This bargain purchase is further supported by the fact that petitioner sold the 1983 Buick a year and a half later for $ 7,800, some $ 1,800 more than he paid for it. The purchase prices do not reflect the fair market values of these automobiles as petitioners assert. Therefore, in determining petitioners' net worth, the values determined by respondent will be included in the computation. C. The Breakwall
Petitioners contend that, in computing their net worth, respondent erroneously included $ 23,000 as the value of the materials and labor provided to petitioners by Specialty Steel for the construction of the breakwall. Respondent submitted an *335 expert report that valued the breakwall at $ 23,000. 1. Expert Report
Gregory S. Zivoder (Zivoder) [10] submitted an expert report valuing petitioners' breakwall at $ 23,000. In reaching this value, Zivoder considered the cost of 55 concrete blocks, the cost of labor to install the blocks, and the rental value and operating costs for the use of a crane and backhoe. Zivoder did not make an on-site inspection of the breakwall; he viewed and photographed it from a Coast Guard cutter on the lake. Zivoder found that 55 blocks had been used to construct the breakwall. He estimated that the manufacture and transportation of each block would *336 cost $ 250, for a total of $ 13,750. Zivoder further estimated that two laborers, each working for 3 days, would be needed for the installation of the blocks. Total labor costs, thus, would be $ 1,080 ($ 180 per man per day for 3 days). In addition, the laborers would need a backhoe to dig out the earth along the shoreline to ensure the proper placement of the blocks. The backhoe would be needed for one 8-hour day at $ 768. A crane would also be needed to lift and place the blocks in position. The cost of a crane for two 8-hour days would be approximately $ 2,370. Zivoder estimated that the cost of transporting the equipment to and from the work site would be $ 500. Thus, he estimated the total cost of the project to be $ 17,388. Zivoder pointed out, however, that this figure did not make allowance for any contingencies, including increases in prices or need for additional materials. Thus, he concluded that 15 percent of the basic cost figure, $ 2,500, would be reasonable for contingencies. Thus, he determined the total cost was $ 19,988, rounded to $ 20,000. Zivoder then made a final adjustment for geographic location. He stated that an adjustment of 115.9 percent of *337 the base figure must be made for the higher cost of construction in Cleveland, Ohio. Therefore, Zivoder concluded that the total adjusted cost of construction of the breakwall was $ 23,180, rounded to $ 23,000. Profits were included in these figures. Zivoder's evaluation is based upon the replacement cost of construction in 1985, the year in which the breakwall was constructed. Zivoder testified that the value was based upon the amount a knowledgeable person would pay to an outsider to construct a soundly engineered breakwall. His report did not consider any "do-it-yourself" aspects. Respondent has determined that the breakwall is an item of income worth $ 23,000. Petitioners contend that it was a gift. The breakwall was constructed by Specialty Steel or by Rochez Brothers Company, the parent company of Specialty Steel. Petitioner represented LTV in contract negotiations with Specialty Steel, a supplier of LTV. Petitioner has not convinced us that this construction was a gift. In order for a transfer to be a gift, we look to the transferor's intent. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). The transfer must proceed from a "'detached *338 and disinterested generosity.'" Id. (quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956)). In this case, it is clear that Rochez Brothers Company and/or Specialty Steel wanted to maintain good relations with petitioner in his capacity an an LTV buyer and decided to build the breakwall for that reason. There was no donative intent and no gift. Therefore, we hold that the value of the breakwall must be included in petitioners' net worth. 2. The Court's Valuation of the Breakwall
Determination of the value of the breakwall is a question of fact. This Court, as the trier of fact, has a duty to weigh all relevant evidence of value and to draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347. In determining the correct value to attach to the breakwall, we have only respondent's expert report. The Court often finds the opinion of expert witnesses to be helpful in understanding an area requiring specialized training, knowledge, or judgment. [11] However, the Court is not bound to accept an expert's opinion. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), *339 affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may adopt some portions and reject other portions of expert testimony as we weigh its persuasiveness and helpfulness. Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938). In fact, if we find a valuation to be defective, the Court independently may reach a valuation determination. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964); affg. T.C. Memo. 1963-244; Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276. In this case, Zivoder evaluated the costs of reconstructing a soundly engineered breakwall on petitioners' *340 property. He did not take into account the actual circumstances of the building of this particular breakwall. Therefore, we accept some of Zivoder's basic cost figures, but we make adjustments to determine the value of the breakwall as actually constructed. We accept Zivoder's calculation of the cost of the blocks in the amount of $ 13,750, the cost of the crane in the amount of $ 2,370, and the cost of labor to operate the crane in the amount of $ 720 (two men at $ 180 per man per day for 2 days). However, the actual breakwall does not conform to the soundly engineered one contemplated by Zivoder in his report. Specialty Steel did not provide a backhoe to petitioner. Photographs of the breakwall indicate that a proper foundation for the blocks was not prepared. Therefore, the costs of the backhoe and additional labor will not be included. We also do not think that additional costs for contingencies, geographical considerations, or profits need be included in this case. Specialty Steel was doing this job as a kickback or bribe to petitioner, and we can assume it was done at basic labor and materials cost. Therefore, we conclude that the cost of constructing the breakwall *341 to be included in the calculation of petitioners' net worth is $ 16,840. D. Stock from Gruninger Estate
Respondent determined that petitioner received nontaxable funds from the estate of Anna Gruninger in the amount of $ 10,240. Petitioner contends that the computation of nontaxable income should reflect the higher amount of $ 17,974.77, the amount received from the estate after the sale of the stock. The computation of petitioners' net worth should include the full amount petitioner received from the sale of the stock, $ 17,974.77, less the nontaxable portion of the distribution from the estate, $ 10,240, the basis (date of death value) of the stock. A recipient of property from a decedent receives a basis in that property equal to its fair market value on the date of decedent's death. Sec. 1014; Brewster v. Gage, 280 U.S. 327 (1930). Therefore, the increase in the stock's value between the date of death and the date of sale represents taxable gain, not a nontaxable portion of the gift. The net figure, $ 7,734.77, is the actual amount by which petitioners' net worth increased due to the stock. [12]
*342 II. Additions for Fraud
Respondent determined in the notice of deficiency that petitioner is liable for the additions to tax for fraud under section 6653(b)(1) and (2) for each of the years at issue. Respondent bears the burden of proof and must establish each element of fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Wright v. Commissioner, 84 T.C. 636, 639 (1985). Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner, 225 F.2d 216, 220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954. Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax believed to be owing. Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); *343 Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Respondent must show that petitioner intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of the tax. Stoltzfus v. United States, supra at 1004; Webb v. Commissioner, supra at 377. Fraud is never to be presumed. Toussaint v. Commissioner, supra at 312; Webb v. Commissioner, supra at 377. The existence of fraud is a question of fact to be determined on the basis of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud, however, can seldom be proved by direct proof of the taxpayer's intention. Fraud can be established by circumstantial evidence and by reasonable inferences drawn from the taxpayer's entire course of conduct. Spies v. United States, 317 U.S. 492, 499 (1943); Toussaint v. Commissioner, supra at 312; *344 Gajewski v. Commissioner, supra at 200. Courts frequently list various factors or "badges of fraud" from which fraudulent intent may be inferred. Although such lists are nonexclusive, some of the factors this Court has considered as indicative of fraud are (1) understatement of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) failure to cooperate with the tax authorities, (6) engaging in illegal activities, and (7) dealing in cash. Meier v. Commissioner, 91 T.C. 273, 297-298 (1988) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601). The taxpayer's evasiveness on the stand, inconsistencies in his testimony, and the lack of credibility of such testimony are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner, supra at 312. Section 6653(b)(1) imposes an addition to tax in the amount of 50 percent of the entire underpayment of tax if any part of the underpayment is due to fraud. *345 In order to establish fraud for purposes of the addition under section 6653(b)(1) for the years at issue, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. By contrast, section 6653(b)(2) applies only to the portion of the underpayment attributable to fraud. Therefore, for purposes of the addition under section 6653(b)(2), respondent must prove by clear and convincing evidence the portion of the underpayment attributable to fraud for each of the years at issue. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Franklin v. Commissioner, T.C. Memo. 1993-184; see also Estate of Stimson v. Commissioner, T.C. Memo 1992-242; Bingo v. Commissioner, T.C. Memo. 1991-248, *346 affd. without published opinion 987 F.2d 74 (11th Cir. 1993). Respondent has met her burden of proving by clear and convincing evidence the existence of an underpayment of tax due to fraud in this case. Petitioner pleaded guilty to filing a false return in the taxable year 1985. Petitioner admitted that the "mistakes" on the 1982, 1983, and 1984 returns were the same as those he had made on the 1985 return. Petitioner was engaged in an illegal kickback scheme and consistently failed to report the income from that scheme for each of the years at issue. He prepared fictitious invoices for LTV suppliers that purported to reflect services provided by Ja-Don. He tried to get representatives of the LTV suppliers to lie about the purpose of the payments to Ja-Don. Petitioner "hedged" and "flip-flopped" when questioned by LTV security personnel and by IRS investigators. We did not find petitioner to be a credible witness, especially in the face of contrary testimony by various other witnesses who participated in the fraudulent kickback scheme. Furthermore, petitioner did not inform his accountant of all of his income during each of the years at issue. *347 Petitioner informed Parhamovich only of amounts for which he had received a Form 1099. He also falsely represented to Parhamovich that he operated a Schedule C business that sold machine parts. Petitioner knew there was no such business, and he knew he was not entitled to deduct the "expenses" of that nonexistent business, most of which were simply nondeductible personal or family expenses. Petitioner is a well-educated man, with a degree in business administration. His explanations were not plausible, and his testimony was not credible. Respondent has met her burden of proving by clear and convincing evidence that the entire underpayment each year is due to fraud. Therefore, we hold that petitioner is liable for the additions to tax for fraud under section 6653(b)(1) and (2) for each of the taxable years at issue. III. Additions for Substantial Understatement
Section 6661(a) provides for an addition to tax in the amount of 25 percent of any underpayment of tax attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. *348 Sec. 6661(b)(1)(A)(i) and (ii). Petitioners understated their income tax each year at issue in an amount greater than $ 5,000 or 10 percent of the tax required to be shown on their return. Generally, if a taxpayer has substantial authority for his tax treatment of an item or has made adequate disclosure thereof on his return, there can be a reduction in the understatement. Sec. 6661(b)(2)(B). There is no substantial authority for failing to report taxable income or deducting nonexistent expenses from a nonexistent business, particularly when such actions, as here, are with intent to evade taxes. Petitioner also made no disclosure on his returns as to his omission of taxable income and intentionally misrepresented that the deductions were incurred in a Schedule C business which did not exist. Accordingly, there is no basis for any reduction of the substantial understatement. [13] We hold that petitioners are liable for the additions to tax under section 6661(a) for each of the years at issue. *349 IV. Statute of Limitations for 1982
Petitioners contend that the statute of limitations bars the assessment of tax for 1982 because they did not file a false or fraudulent tax return for that year. The general rule of section 6501(a) provides that a tax is to be assessed within 3 years after the return was filed. An exception to this general rule is contained in section 6501(c). That section provides that, if a taxpayer files a false or fraudulent return with an intent to evade tax, the tax may be assessed at any time, and the statute of limitations shall not bar such assessment. As discussed above, respondent has shown that petitioner Donald W. Weber filed false and fraudulent returns for all of the years at issue. Respondent has established his pattern of intentional inaccuracies and omissions in the returns, and the fraud of one spouse will keep the year open as to both spouses. [14] Therefore, the statute of limitations does not bar assessment for the taxable year 1982 in this case. *350 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. 50 percent of interest due on $ 9,323.↩
2. 50 percent of interest due on $ 8,306.↩
3. 50 percent of interest due on $ 26,932.↩
4. 50 percent of interest due on $ 17,883.↩
1. Petitioners do not contest the amount of the deficiency for 1982. The parties agree that petitioner Jane Weber (Mrs. Weber) is not liable for the additions to tax for fraud under sec. 6653(b)(1) and (2). The parties further agree that Mrs. Weber is liable for the additions to tax for negligence under sec. 6653(a)(1) and (2) for the full amount of the deficiencies. Petitioners concede that their income for the 1984 tax year should be increased to reflect respondent's reduction of their Schedule E loss from Western Tel-Com, Ltd., from ($ 24,950) as reported on their 1984 Federal income tax return to ($ 18,159). Petitioners also concede that they are liable for the addition under sec. 6659 for 1984 and that the underpayment attributable to the valuation overstatement is a substantial underpayment attributable to tax-motivated transactions for the purpose of computing the interest payable under sec. 6621(c). Petitioners also agree to the adjustment for capital gains and losses for 1984.↩
2. "Machining" is the rebuilding and reconditioning of steel parts or the replacement with new parts. "Fabricating" involves welding various metal pieces together to form a part.↩
3. On the Schedule C filed each year, petitioner listed his home address as the business address of Ja-Don and deducted portions of his household and family expenses as business expenses.↩
4. Petitioners paid for their other expenses.↩
5. The breakwall is a retaining wall designed to protect petitioner's property from rises in Lake Erie's level. Petitioner had asked Metalkrafters to pay for the construction of a breakwall at his residence but the company declined to do so.↩
6. The dimensions of the concrete blocks were 3 ft. by 3 ft. by 7 ft.↩
7. The owner of Tenk reclaimed the lawn mower after his daughter drove past petitioner's house and saw a for sale sign on the mower.↩
8. Petitioner testified that he performed engineering services during the years in issue. The Court did not believe him. Neither petitioner nor Ja-Don ever performed engineering services for Jerpbak-Bayless, and petitioner never told his tax return preparer that he performed such services. The Court is convinced that he never performed any engineering services for any of LTV's suppliers or for anyone else.↩
9. Mrs. Weber told the agents that, at the initial meeting, one bank account had not been disclosed. Mrs. Weber explained that petitioner previously had been divorced and "did not trust wives". Because of this, according to Mrs. Weber, petitioner had been secreting money from normal household expenses and depositing it into a special account.↩
10. Gregory S. Zivoder has a bachelor of science degree in industrial and systems engineering and has received further training in real estate appraisal and the standards of professional practice from the Appraisal Institute. Zivoder has served as an industrial engineer with various corporations and has been a general engineer with the Internal Revenue Service since 1977.↩
11. Estate of Bennett v. Commissioner, T.C. Memo. 1993-34; Estate of Rodriguez v. Commissioner, T.C. Memo. 1989-13↩.
12. Petitioner failed to include this gain on his tax return for the year of the sale. This gain should be taxed at the long-term or short-term capital gain rate, depending upon the holding period. This computation can be made during the Rule 155 proceeding.↩
13. However, the sec. 6661 addition does not apply to that portion of the understatement for 1984 on which a sec. 6659 addition is imposed. See sec. 6661(b)(3); supra↩ note 1.
14. Ballard v. Commissioner, 740 F.2d 659, 662-663 (8th Cir. 1984), affg. on this issue and revg. T.C. Memo. 1982-466; Benjamin v. Commissioner, 66 T.C. 1084, 1100 (1976), affd. 592 F.2d 1259 (5th Cir. 1979); Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970); Savage v. Commissioner, T.C. Memo. 1992-129; Clevenger v. Commissioner, T.C. Memo. 1986-149, affd. 826 F.2d 1379↩ (4th Cir. 1987).