T.C. Memo. 1996-506


UNITED STATES TAX COURT


PABST BREWING COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18466-92.                    Filed November 12, 1996.


        P brews and sells beer.  During the relevant
years, many individuals and companies sought control
over P through means which included hostile takeovers,
tender offers, and proxy contests.  Pursuant to an
agreement between P and H, H bought a majority of P's
shares in a public tender offer, and P distributed
certain assets to H in exchange for all of P's shares
held by H and the assumption by H of a certain
liability.  In connection therewith, P and H entered
into an allocation agreement that set forth a dollar
amount for each transferred asset.  P and R dispute
that the amount assigned to each asset is that asset's
fair market value.  P claims that the fair market value
is significantly lower than the assigned amount.  R
claims that the fair market value is significantly
higher than the assigned amount.  <u>Held</u>: The aggregate
fair market value of the transferred assets equals the
amount set forth in the allocation agreement for all of
the assets.  <u>Held</u>, <u>further</u>:  The fair market value of

each asset is the corresponding amount set forth in the allocation agreement.

William M. Bitting, William A. White, and Dean E. Dennis, for petitioner.

Alan M. Jacobson and Steve R. Guest, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Pabst Brewing Co. petitioned the Court to redetermine respondent's determination of the following deficiencies in its Federal income taxes and additions thereto under section 6661:

|                        |            | Additions to Tax |
| Year or period ended   | Deficiency | Sec. 6661        |
| ---------------------- | ---------- | ---------------- |
| 12/31/81               | $58,241    | ---              |
| 3/18/83                | 28,188,661 | $4,167,682       |
| 3/19/83[1]             | 28,188,661 | 4,167,682        |
| 12/31/83               | 2,483,904  | 620,976          |
| 12/31/84               | 2,953,841  | ---              |
| 2/28/85                | 234,115    | 58,529           |

[1]Petitioner had two taxable periods during the 1983 calendar year, the first period ended in mid-March and the second period ended Dec. 31.  Petitioner filed its return using Mar. 18, 1983, as the ending date of the mid-March period.  Respondent determined that the proper ending date was Mar. 19, 1983, but alternatively determined that the taxable period ended Mar. 18, 1983.  The parties agree that the mid-March period ended Mar. 19, 1983.

Following the resolution of all other issues in this case, we must decide the fair market value of certain assets (Transferred Assets) that petitioner transferred to G. Heileman Brewing Co. (Heileman) during the taxable period ended March 19, 1983.

Generally, petitioner transferred these assets to Heileman through the following two steps: (1) Heileman acquired a controlling block of petitioner's stock through a public tender offer and (2) petitioner distributed the Transferred Assets to Heileman in exchange for its surrender of that stock, as well as other consideration. In Pabst Brewing Co. v. Commissioner, T.C. Memo. 1995-239, we held that petitioner's transfer of the assets was in redemption of its stock. Thus, we held, the transfer was subject to section 311(d)(1), and petitioner had to recognize gain on the transfer based on the fair market value of each Transferred Asset. We hold herein that the aggregate fair market value of the Transferred Assets equals the total amount set forth in a written allocation agreement (Allocation Agreement) that petitioner and Heileman entered into with respect to the exchange. We also hold that the fair market value of each Transferred Asset is the corresponding amount set forth in the Allocation Agreement. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the subject years. Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. Petitioner's principal place of business was in Mill Valley, California, when it

petitioned the Court.  At all relevant times, petitioner was principally engaged in the brewing and sale of malt beverages (beer).  Its brands of beer were:  (1) Pabst Blue Ribbon, (2) Andeker, Pabst Extra Light, (3) Red, White & Blue, (4) Burgermeister, (5) Blitz-Weinhard, (6) Henry Weinhard Private Reserve and Bohemian beers, and (7) Olde English 800 Malt Liquor. Its brewing facilities (with annual capacity) were situated in: (1) Milwaukee, Wisconsin (5.5 million barrels), (2) Newark, New Jersey (2.5 million barrels), (3) Perry, Georgia (5.0 million barrels), and (4) Portland, Oregon (2.0 million barrels).[1]

During the 1970's and 1980's, the brewing industry was dominated by Miller Brewing Co. (Miller) and Anheuser Busch, Inc. (Anheuser Busch), two large brewers that continued to expand their operations and grow rapidly during these years.  Smaller breweries generally became obsolete because they were unable to compete with Anheuser Busch, Miller, and other large brewers from a cost-effective or profitability point of view.  Many of the smaller breweries were forced to liquidate, selling their brewing-related assets to other breweries at fire-sale prices, or

---

[1] The parties in their stipulation of facts sometimes refer to the brewery in Georgia as situated in the City of Pabst.  We have looked at a map of Georgia, and we are unable to find any city in Georgia named Pabst.  We believe that the parties have mistakenly referred to the City of Perry as "Pabst", and we proceed on that belief.  We note, however, that our belief has no bearing on our holdings herein.

they were forced to attempt to grow by merging with one or more competitors.

In late 1981, petitioner's management began exploring several alternatives to allow petitioner's shareholders to realize the underlying asset value of their investment in petitioner. During the last quarter of 1981, the market price of petitioner's stock fluctuated between $11.75 and $15.75 per share. Many individuals and companies had sought (and were seeking) control over petitioner through means that included hostile takeovers, tender offers, and proxy contests. These individuals and companies included Heileman, C. Schmidt & Sons, Inc. (Schmidt), Irwin L. Jacobs (Jacobs), Paul Kalmanovitz (Kalmanovitz), and JMSL Acquiring Corp. (JMSL), a Delaware corporation formed by Jacobs, Dennis M. Mathisen (Mathisen), and two other individuals (collectively the Jacobs Group).[2] The Jacobs Group had begun making substantial purchases of petitioner's stock in November 1980, purchasing in that month almost 10 percent of its outstanding stock, and the Jacobs Group had acquired nearly 14 percent of petitioner's outstanding stock by October 1982. In an attempt to obtain total control over petitioner, the Jacobs Group and its designees (collectively, the

[2] Heileman was a Wisconsin corporation engaged in the brewing and sale of beer. Schmidt was a brewery about one-fourth the size of petitioner. Jacobs was an investor who had previously acquired and sold another brewer. Kalmanovitz was the owner of numerous other brewers.

Dissident Group) announced an intent to start a proxy fight at petitioner's annual meeting of shareholders, scheduled for April 13, 1982. In anticipation of that meeting, petitioner's incumbent management and JMSL (through a group called the Shareholders' Committee to Revitalize Pabst) proposed competing slates of nominees for election to petitioner's board of directors (the Board) and solicited proxies from petitioner's shareholders in order to elect the desired directors. The Jacobs Group was unsuccessful in its attempt to acquire control over petitioner at the 1982 annual meeting. The incumbent directors received approximately 54 percent of the votes cast at the meeting, and the Dissident Group received the rest.

In May 1982, Heileman began exploring the possibility of a business combination with petitioner.[3] Heileman's management believed that Heileman had to acquire the Transferred Assets to start a brewing operation in the southeastern United States in order to be competitive in the beer industry. Meetings were held with representatives of the U.S. Department of Justice (Justice Department) concerning the antitrust aspects of a combination between petitioner and Heileman. At the time, Heileman was subject to a 1973 consent decree with the Justice Department that

---

[3] Contemporaneously therewith, Schmidt had offered to buy shares of petitioner's stock at $20.50 in cash plus a $5 note, but the Board rejected this offer. The Board had also rejected an earlier offer of Schmidt to buy petitioner's stock at $16 per share.

prevented Heileman from acquiring any brewing concern in an eight-State area of the Midwestern United States. Shortly after Heileman announced on May 28, 1982, that it intended to acquire all of petitioner's shares in a merger transaction by paying cash of $24 per share, the Justice Department announced that it would oppose the proposed acquisition due to the 1973 consent decree.

When Heileman and petitioner were discussing their possible affiliation, representatives of petitioner and Olympia Brewing Co. (Olympia) were discussing a business combination of their two companies. Olympia was a competitor of petitioner, with brewing facilities in: (1) Tumwater, Washington, (2) St. Paul, Minnesota, and (3) San Antonio, Texas. Olympia's brands of beer were: (1) Olympia, (2) Olympia Gold (light beer), (3) Hamm's, (4) Hamm's Special Light, (5) Lone Star, (6) Lone Star Light, (7) Buckhorn, and (8) Grenzquell. Petitioner's management believed that a combination of petitioner and Olympia would be good from a business point of view, and that it would allow petitioner's shareholders to realize cash or cash equivalents for their shares through a recapitalization. On June 2, 1982, petitioner's wholly owned subsidiary, PBC Corp. (PBC), commenced a cash tender offer for 1.27 million shares of Olympia at $26 per share (PBC Offer). Eight days later, petitioner and PBC entered into a definite agreement with Olympia providing for a business combination between petitioner and Olympia (June 10, 1982, Agreement). Under the June 10, 1982, Agreement, the PBC

offer was raised to $28 per share in cash.  The second step of the proposed combination, if approved by Olympia's shareholders, was to undertake expeditiously a transaction in which the Olympia shares still outstanding (i.e., shares not purchased under the PBC Offer) would be exchanged for securities and/or cash having a fair market value of not less than $26 per Olympia share.

On June 23, 1982, the Jacobs Group, through JMSL, offered to buy all of petitioner's outstanding shares (First JMSL Offer) at $24 per share if petitioner and PBC terminated PBC's offer for Olympia shares, and $22 per share if the PBC offer was not terminated.  Prior to making the First JMSL Offer, JMSL entered into a "put" agreement (Put Agreement) with Heileman under which JMSL could compel Heileman to purchase petitioner's breweries in Newark, New Jersey, and Perry, Georgia, together with an exclusive license to produce and market all of petitioner's brands in a 27-State area, if JMSL elected a majority of the directors on the Board.  In response to the First JMSL Offer, Olympia, through its wholly owned subsidiary OBC Acquisition, Inc. (OBC), made a competing offer on July 6, 1982, to purchase 4 million of petitioner's shares (approximately 49 percent of its outstanding stock) at $25 per share in cash (OBC Offer).  The OBC Offer stated that, if it were successful, each of petitioner's shares that OBC did not purchase for cash would be exchanged pursuant to a merger for 1 share of a new class of convertible preferred stock of a combined petitioner/Olympia entity.

On July 14, 1982, pursuant to the June 10, 1982, Agreement, PBC purchased 1.27 million shares of Olympia (49 percent of its outstanding shares) for $28 per share.

On July 22, 1982, the Justice Department announced in a press release that it would oppose the First JMSL Offer because the proposed sale of the assets to Heileman pursuant to the Put Agreement raised serious antitrust concerns and made it unlikely that the surviving entity would survive in the long term. On the same date, the U.S. District Court for the District of Delaware (District Court) issued preliminary injunctions enjoining both the First JMSL Offer and the OBC Offer. On July 23, 1982, JMSL terminated the First JMSL Offer. OBC terminated the OBC Offer 3 days later.

After the termination of these offers, Jacobs and Mathisen met with William F. Smith, Jr. (Smith), petitioner's president and chief executive officer, and one of petitioner's distributors to discuss the demands of the Jacobs Group, including a possible restructuring of the Board. These negotiations were unsuccessful and, on August 31, 1982, members of the Dissident Group announced that they would seek removal of the incumbent directors of the Board and attempt to replace them with the Dissident Group's nominees by soliciting the consent of the owners of a majority of petitioner's outstanding shares. The Dissident Group's consent materials stated that, if the Dissident Group's nominees were elected as directors, they would use every effort to implement

expeditiously a cash tender offer by petitioner to redeem its shares at $23 per share. The Dissident Group subsequently delivered written consents to petitioner's management, purportedly representing the consents of shareholders holding a majority of petitioner's shares, authorizing the removal of the incumbent directors and election of the Dissident Group nominees in their place.

On September 15, 1982, petitioner and Smith commenced an action against the members of the Jacobs Group in the District Court challenging the legality of the solicitation of consents and seeking to prevent the redemption process. On October 13, 1982, the District Court held that the Dissident Group's solicitation materials violated certain provisions of the Federal securities laws, that the written consents obtained by the Dissident Group and delivered to petitioner's management were of no legal effect, and that the incumbent directors on the Board remained petitioner's duly constituted directors. See Pabst Brewing Co. v. Jacobs, 549 F. Supp. 1068 (D. Del. 1982), affd. without published opinion 707 F.2d 1392, 1394 (3d Cir. 1982).

On October 27, 1982, JMSL commenced a second tender offer (Second JMSL Offer) pursuant to which JMSL sought to purchase up to 3 million shares of petitioner's stock for $24 per share in

cash.[4]  At that time, JMSL was owned through a Delaware holding company, PST Acquiring Corp. (PST), which was owned 50 percent by the members of the Jacobs Group and 50 percent by Kalmanovitz. Petitioner's shares were trading on the New York stock exchange at approximately $20 per share.

In response to the Second JMSL Offer, petitioner and Heileman entered into an agreement in principle on November 5, 1982, as later amended on November 9 and 26, 1982 (Agreement in Principle).  The Agreement in Principle was the product of arm's-length negotiations between petitioner and Heileman.  As originally drafted, the Agreement in Principle contemplated the following transaction:  (1) Heileman's acquisition of petitioner and Olympia by way of a merger, (2) Heileman's retention of certain assets of petitioner and Olympia, and (3) a spinoff of the remaining assets to a new entity of which Heileman would not be a shareholder.  To effectuate the merger, the Agreement in Principle provided that Heileman, through a wholly owned subsidiary, would make a cash tender offer to acquire petitioner's stock.

On November 10, 1982, pursuant to the Agreement in Principle, Heileman commenced a tender offer (First HBC Offer) through its wholly owned subsidiary, HBC Acquisition, Inc. (HBC),

---

[4] The 3 million shares, when combined with the shares the Jacobs Group already owned, constituted a controlling interest in petitioner.

to purchase up to 5.5 million shares of petitioner at $27.50 per share in cash.  The First HBC Offer was the first step in implementing the Agreement in Principle.  At or about the same time, the Board concluded that the $24 per share offered by JMSL was inadequate and not in the best interests of petitioner or its stockholders.  The Board's decision was partially based on a written opinion (fairness opinion) that the Board received from petitioner's investment banker, Lehman Brothers Kuhn Loeb, Inc. The fairness opinion stated that:  (1) The $24 price offered in the Second JMSL Offer did not fully represent or reflect the value of a control position in petitioner and (2) the transactions contemplated by the Agreement in Principle, including the First HBC Offer, were, taken as a whole, superior to the Second JMSL Offer and the possible second-step merger involving petitioner proposed by JMSL.

The First HBC Offer and the Second JMSL Offer spawned extensive litigation among the interested parties.  See, e.g., Pabst Brewing Co. v. Kalmanovitz, 551 F. Supp. 882 (D. Del. 1982); Jacobs v. G. Heileman Brewing Co., 551 F. Supp. 639 (D. Del. 1982).  On November 17, 1982, the District Court preliminarily enjoined JMSL, PST, the Jacobs Group, and Kalmanovitz from consummating the Second JMSL Offer unless additional disclosures were mailed by JMSL to petitioner's shareholders.  In response, JMSL mailed to petitioner's shareholders an amendment to the Second JMSL Offer, dated

November 18, 1982, purporting to make the additional disclosures ordered by the District Court and raising its offer price to $30 per share for the 3 million shares it was seeking. On November 23, 1982, JMSL announced in a press release that it had again increased the Second JMSL Offer price to $35 per share. On November 24, 1982, the District Court denied the motion of the Jacobs Group and Kalmanovitz for a preliminary injunction against the First HBC Offer.

On November 22, 1982, the Justice Department's antitrust division filed a civil suit against petitioner and Heileman, a stipulation, and a proposed final judgment (1982 Consent Decree) in the District Court. See United States v. G. Heileman Brewing Co., 563 F. Supp. 642 (D. Del 1983). The complaint alleged that competition in the United States beer industry might be substantially lessened if Heileman acquired and exercised control over petitioner and Olympia. Petitioner and Heileman agreed to be bound by all of the terms of the 1982 Consent Decree pending its approval by the District Court. After reviewing the proposed 1982 Consent Decree to determine whether it was in the public interest, the District Court approved and entered it. The 1982 Consent Decree ensured that the essential terms of the Agreement in Principle, including Heileman's acquisition of the Transferred Assets and the transfer of the other assets to unrelated parties, would be consummated. In relevant part, the decree provided that Heileman intended to acquire only certain assets of petitioner

and Olympia and that it did not intend to acquire or exercise

control over any other asset.  The decree also provided:

> A. Until the appointment of a trustee under this Final Judgment, Heileman shall be free to vote in any manner the stock of Pabst, subject to * * * [the Justice Department's] prior approval.  Heileman shall not otherwise manage or control Pabst or Olympia in any manner directly or indirectly.  Furthermore, Heileman shall not have access to any confidential business information, data or records of Pabst or Olympia concerning the Non-Retained Assets.  Heileman shall have access to confidential business information, data and records of Pabst and Olympia concerning the Retained Assets; provided, however, that such access shall only take the form of the submission of written material to Heileman by Pabst and Olympia (unless * * * [the Justice Department] specifically agrees otherwise) and provided further that * * * [the Justice Department] shall be furnished with copies of all materials furnished to Heileman at the same time as such materials are furnished to Heileman.

On November 24, 1982, HBC amended the First HBC Offer by

decreasing the number of petitioner's shares sought from 5.5

million to 4.25 million.  As a result, Jacobs believed that the

First HBC Offer would prevail and that he might be shut out of

the related proration pool.  That afternoon, Jacobs telephoned

Heileman's president, Russell G. Cleary (Cleary), in order to

discuss the terms of a possible settlement.  Jacobs told Clearly

that JMSL would withdraw from the bidding for petitioner's shares

in exchange for payment of its legal and related expenses

totaling $7.5 million.

On November 26, 1982, Heileman, HBC, petitioner, and the

Jacobs Group announced a settlement (Settlement Agreement), with

the Jacobs Group breaking off its relationship with Kalmanovitz

and supporting a new HBC tender offer. Pursuant to the Settlement Agreement, the members of the Jacobs Group agreed to cease their participation in the Second JMSL Offer and HBC agreed to terminate the First HBC Offer and to commence a new tender offer for petitioner's shares at $29 per share. The Settlement Agreement also provided that the members of the Jacobs Group would tender their approximately 1.14 million shares of petitioner (Jacobs Group Shares) into a second HBC offer (Second HBC Offer). The Settlement Agreement further provided that the Jacobs Group granted to petitioner an option to purchase all of the Jacobs Group Shares not purchased in the Second HBC Offer or sold by the Jacobs Group prior to the exercise of the option. The option had to be exercised during certain option periods, but in no event later than June 30, 1983. Petitioner never exercised the option or otherwise repurchased any shares from the Jacobs Group.[5]

---

[5] The Settlement Agreement contained several other provisions. For example, the Jacobs Group agreed that none of its members (nor an affiliate of any member) would offer to purchase or otherwise acquire any shares of petitioner, HBC, Olympia, or any affiliate or successor to those corporations, for a period of 5 years. The parties to the Settlement Agreement also agreed to take all steps necessary to terminate with prejudice most of the litigation pending between them. As long as no Jacobs Group Shares were withdrawn from the Second HBC Offer, the Jacobs Group was entitled under the Settlement Agreement to a cash payment of $7.5 million for its legal and related expenses, with the cost to be split equally between Heileman and petitioner.

On November 26, 1982, Jacobs called Kalmanovitz to inform him of the Settlement Agreement. Kalmanovitz refused to join in the Settlement Agreement.

Pursuant to the Settlement Agreement, HBC terminated the First HBC Offer on November 30, 1982, and, 2 days later, HBC commenced the Second HBC Offer for 3.75 million shares of petitioner at $29 per share, with HBC reserving the right to purchase up to 5.6 million shares at that price. On December 3, 1982, JMSL terminated the Second JMSL Offer.

On December 6, 1982, 21-115, Inc., a corporation owned by Paul and Lydia Kalmanovitz, commenced a tender offer for 4.15 million shares of petitioner at $32 per share (First Kalmanovitz Offer). The First Kalmanovitz Offer provided that, if 4.15 million shares were purchased pursuant thereto, the remaining shares would be redeemed in exchange for petitioner's 15-percent subordinated notes with a principal amount of $26 each. On December 10, 1982, Kalmanovitz and another company owned by him brought an action in the District Court against Heileman, Cleary, HBC, petitioner, and Smith to stop the Second HBC Offer. See Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385 (D. Del. 1984), affd. 769 F.2d 152 (3d Cir. 1985). The court denied Kalmanovitz' request.

HBC amended the Second HBC Offer on December 10, 1982, increasing the number of petitioner's shares sought to 5.6 million. On December 15, 1982, Heileman amended the Second HBC

Offer again to increase the price per share to $32. On December 22, 1982, 21-115, Inc., raised the price in the First Kalmanovitz Offer to $40 per share and increased the annual interest rate on the proposed subordinated notes to 18 percent.

As of 12 a.m. on December 23, 1982, the deadline for withdrawal under the Second HBC Offer, approximately 6.7 million of petitioner's shares remained tendered to HBC. Later on that day, HBC accepted 5.6 million of these shares for payment at $32 per share (total price of $179.2 million), thereby completing the Second HBC Offer. The 5.6 million shares represented approximately 68 percent of petitioner's 8,185,541 outstanding shares. On December 28, 1982, 21-115, Inc., terminated the First Kalmanovitz Offer. Thereafter, Kalmanovitz filed two lawsuits seeking damages against Heileman, Cleary, petitioner, Smith, HBC, and the Jacobs Group.

Following the successful completion of the Second HBC Offer, and pursuant to the Agreement in Principle, petitioner entered into several written agreements with Heileman, HBC, PBC, and Olympia, including an acquisition agreement dated December 30, 1982, and amended February 24, 1983 (Acquisition Agreement). The transaction that actually occurred as a result of these agreements differed in form from the transaction originally contemplated by the Agreement in Principle.[6] Under the Agreement

---

[6] For a diagram of the transaction that actually occurred,
(continued...)

in Principle, Heileman was to obtain the assets it desired through a merger with Olympia and petitioner, and Heileman was to spin off the unwanted assets to unrelated parties. Under the Acquisition Agreement, which reflects the transaction actually carried out, Heileman did not merge with Olympia or petitioner. Instead, Olympia merged into petitioner, and the merged entity (petitioner) distributed certain assets to Heileman "in exchange for" all of Heileman's shares of HBC, whose sole asset was petitioner's stock acquired in the successful tender offer.[7] The 5.6 million shares of petitioner's stock held by HBC prior to the transaction were canceled. Heileman had paid $179.2 million to purchase these shares on December 23, 1982, pursuant to the tender offer.

The following assets were distributed to Heileman on March 18 and 19, 1983, pursuant to the actual transaction: (1) Petitioner's brewery in Perry, Georgia; (2) petitioner's brewery in Portland, Oregon; (3) the Blitz-Weinhard, Henry-Weinhard Private Reserve, Blitz economy, Red, White & Blue,

---

[6](...continued)
see Pabst Brewing Co. v. Commissioner, T.C. Memo. 1995-239.

[7] Because HBC was a wholly owned subsidiary of Heileman, whose sole function was to facilitate the tender offer, for convenience we sometimes refer to Heileman's surrender of its HBC stock as a surrender by Heileman of the 5.6 million shares of petitioner's stock held by HBC. The parties themselves sometimes refer to the surrender of these shares as coming directly from Heileman, and this simplification does not affect our holdings.

and Burgermeister beer brands, as well as all related light products; (4) 100,000 kegs in addition to the kegs which were included as part of the breweries in Perry and Portland; (5) $10 million in surplus assets selected by petitioner and Heileman; (6) petitioner's office building and related parking areas in Milwaukee, Wisconsin; (7) nonbrewery assets which included certain surplus bottles and real estate situated in Milwaukee; (8) net working capital aggregating at least $30 million; (9) Olympia's brewery in San Antonio, Texas; (10) the Lone Star and Buckhorn (Texas) beer brands and related light products; (11) real estate in the State of Washington; and (12) any other assets listed in the Allocation Agreement.

In addition to its surrender of the shares which were canceled, Heileman assumed a $3.48 million liability for certain industrial development revenue bonds (IDB's) as consideration for the distribution of the assets. The IDB's represented financing for the Olympia Lone Star brewery in San Antonio, which was transferred to Heileman as part of the Transferred Assets. Petitioner also paid Heileman $4.25 million in cash on March 18, 1983, in redemption of 400,005 shares of stock in petitioner (approximately 5 percent of petitioner's outstanding shares) acquired by Heileman prior to the tender offer, and petitioner added these shares to its treasury stock. Heileman had previously paid $7,607,325 to acquire these shares. In addition, petitioner and Heileman entered into a 5-year manufacturing

agreement whereby petitioner was required to purchase specified amounts of beer at a designated markup over actual cost, the beer to be brewed by Heileman at the Perry facility, and Heileman agreed to lease petitioner the office building and related parking areas in Milwaukee.

Petitioner and Heileman also entered into the Allocation Agreement, dated February 10, 1983, whereby they agreed to the price to be allocated to each of the Transferred Assets. The Allocation Agreement states that Heileman and petitioner "hereby agree that for purposes of determining exchange values between them in connection with the acquisition of various assets", the Transferred Assets total $190,287,375.[8] The Allocation Agreement further states:

The price to be allocated is as follows:

| | |
|---|---|
| Cash | $4,250,000 |
| Working capital | 30,000,000 |
| 100,000 kegs | 2,500,000 |
| 1,000,000 cases of select bottles | 1,000,000 |
| Other kegs, bottles, cases, pallets | 3,500,375 |
| Other assets | 10,000,000 |
| Brands and distributors | 1,500,000 |

Georgia plant:

---

[8] This total is derived from the sum of: (1) The price paid by Heileman for the 5.6 million tendered shares that were redeemed in the transaction ($179.2 million), (2) the price paid by Heileman for the 400,005 shares of petitioner that Heileman owned prior to the tender offer, which were also redeemed in the transaction ($7,607,325), and (3) the $3.48 million of IDB's that were assumed by Heileman pursuant to the transaction. The record does not explain the $50 difference between the sum of these three amounts ($190,287,325) and the figure contained in the Allocation Agreement ($190,287,375). We find the $50 difference insignificant for purposes of deciding this case.

|                          |              |
|--------------------------|-------------:|
| Land                     | 864,000      |
| Building                 | 29,747,000   |
| Machinery & equipment    | 58,731,000   |
| Construction in progress | 1,170,000    |
| Portland:                |              |
| Land                     | 3,140,000    |
| Building                 | 5,290,000    |
| Machinery & equipment    | 12,789,000   |
| Construction in progress | 220,000      |
| San Antonio:             |              |
| Land                     | 1,196,000    |
| Building                 | 5,190,000    |
| Machinery & equipment    | 6,300,000    |
| Washington land:         |              |
| Milwaukee                |              |
| Office land              | 1,000,000    |
| Office building          | 10,000,000   |
| Other buildings          | 875,000      |
| Other land               | 425,000      |
|                          | 190,287,375  |

The parties agree they will take no action inconsistent with such valuation in filing their respective income tax returns.

On February 26, 1983, petitioner and Olympia issued a prospectus/proxy statement to their shareholders seeking approval of the transaction described above. On March 18, 1983, at separate special meetings, the shareholders of petitioner and Olympia approved and adopted the Acquisition Agreement and the other relevant agreements. Petitioner's shareholders who dissented thereto were entitled to receive $27 a share for their stock. See Cooper v. Pabst Brewing Co., No. Civ. A. 7244 (Del. Ch., June 8, 1993) (dissenting shareholders' stock appraised at $27 per share).

Petitioner's shareholders of record at the time of the transaction (excluding Heileman, HBC, petitioner, any of their subsidiaries, and any shareholders asserting their appraisal

rights) had each of their shares converted into one $24 principal amount 15-percent subordinated, sinking fund note of petitioner with a 10-year maturity.[9]  As a result, the former shareholders of petitioner, other than Heileman, had no further equity interest in petitioner following the transaction.

Olympia stockholders of record at the time of the transaction had each of their Olympia shares converted into the right to receive:  (1) One share of petitioner's stock and (2) cash equal to the excess, if any, of $26 per share over the average market value of petitioner's shares during a specified 11-day trading period.  As a result, the former Olympia shareholders became petitioner's new shareholders following the transaction.

On its tax returns, petitioner reported the distribution of the Transferred Assets as a sale subject to section 1001, and it used the $190,287,375 amount set forth in the Allocation Agreement as the amount realized on the sale.  For the taxable period January 1 through March 18, 1983, petitioner reported a net gain of $40,362,574 resulting from the transfer of some of the Transferred Assets to Heileman on the latter date.  For the taxable period March 19 through December 31, 1983, petitioner

---

[9] In order to discourage future hostile takeover attempts, tender offers, and proxy contests, certain provisions of the indenture, pursuant to which these notes were issued, limited the incurrence of indebtedness for the purpose of acquiring petitioner's shares.  Petitioner also amended its certificate of incorporation.

reported a net gain of $23,840,818 resulting from the transfer of the remainder of the assets to Heileman on the former date.

Respondent, as reflected in her notice of deficiency, determined that the fair market value of the Perry and Portland breweries and the brands of beer exceeded the values reported by petitioner.  On June 6, 1996, petitioner amended its petition to raise the issue of the fair market value of the San Antonio brewery.

In 1983, there was a market for brewing assets, and there were brewers that could have purchased and utilized the relevant breweries, as well as the brands of beer.

OPINION

Following a 3-day trial, we must decide the fair market values of the Transferred Assets.  The parties have agreed that the values of certain assets equal the amounts set forth in the Allocation Agreement, leaving the Court to decide the values of the Perry, Portland, and San Antonio breweries, as well as the brands of beer.  The record is replete with charts, graphs, data, testimony, and expert opinion.  We must evaluate all of the evidence and render a judgment.  As the Court has observed, the valuation of property is an inexact science, and, if not settled by the parties, must be resolved by the judiciary by way of "Solomon-like" pronouncements.  Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980); Messing v. Commissioner, 48 T.C. 502, 512 (1967); see also Mandelbaum v.

Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).

As typically occurs in a case of valuation, the parties rely primarily on their experts' testimony and reports to support the parties' contrary positions on the valuation issue.  Expert testimony sometimes aids the Court in determining valuation. Other times, it does not.[10]  The Court is not bound by an opinion of an expert.  Aided by our common sense, we weigh the helpfulness and persuasiveness of an expert's testimony in light of his or her qualifications and in the context of all other credible evidence in the record.  Depending on what we believe is appropriate under the facts and circumstances of the case, we may reject an expert's opinion in its entirety, accept it in its entirety, or accept only selective portions of it.  Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276; In re Williams Estate, 256 F.2d 217, 219 (9th Cir. 1958), affg. T.C. Memo. 1956-239; Seagate Technology v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986).  The Court has previously rejected an expert's testimony as incredible when the expert's opinion of value was so exaggerated as to make it unrealistic.  See Chiu v.

---

[10] For example, expert testimony is not useful to the Court when the expert is merely an advocate for the position argued by the party.  Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

Commissioner, 84 T.C. 722 (1985); Dean v. Commissioner, 83 T.C. 56, 75 (1984); Fuchs v. Commissioner, 83 T.C. 79, 99 (1984).

Petitioner must prove that respondent's determination of fair market value set forth in her notice of deficiency is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioner must also prove that the fair market value of the San Antonio brewery is different than the value reported on its tax return. Rule 142(a). A determination of fair market value is factual, and a trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., supra at 294; Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under any compulsion to buy or to sell. Sec. 20.2031-1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the characteristics of these

hypothetical persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer. Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Jung v. Commissioner, 101 T.C. 412, 437-438 (1993); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Minihan v. Commissioner, 88 T.C. 492, 499 (1987).

Fair market value is determined as of the valuation date, and no knowledge of unforeseeable future events which may have affected the value is given to the hypothetical persons. Sec. 20.2031-1(b), Estate Tax Regs; see also Estate of Newhouse v. Commissioner, supra at 218. Fair market value equals the highest and best use to which the property could be put on the valuation date, and fair market value takes into account special uses that are realistically available due to the property's adaptability to a particular business. Mitchell v. United States, 267 U.S. 341, 344-345 (1925); Symington v. Commissioner, 87 T.C. 892, 896 (1986); Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986). Fair market value is not affected by whether the owner has actually put the property to its highest and best use. The reasonable, realistic, and objective possible uses for the property in the near future control the valuation thereof. Olson v. United States, 292 U.S. 246, 255 (1934); United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958); Stanley Works & Subs. v. Commissioner, supra at 400.

Elements affecting value that depend upon events or a combination of occurrences which, while within the realm of possibility, are not reasonably probable, are excluded from this consideration. Olson v. United States, supra at 257.

Petitioner claims that the fair market values of the subject assets were "significantly less" than the amounts included in the Allocation Agreement. Petitioner supports its statement with the testimony of its two experts, Arthur J. Tonna (Tonna) and Gilbert E. Matthews (Matthews). Tonna has worked for more than 40 years in the brewing industry, approximately 18 years of which he has been employed as the senior or executive vice president of the operations of a major brewer. He has participated in major brewery sales, including brands, and he has purchased the used facilities and equipment of breweries undergoing liquidation. He has previously testified in this Court as an expert on the value of brewery equipment and machinery. Matthews received a bachelor of arts degree from Harvard in 1951, and he received a master's degree in business administration from Columbia in 1953. From 1970 through 1995, he chaired the valuation committee for Bear Stearns, and he was responsible for more than 1,000 of the firm's valuation opinions, most of which concerned the purchase or sale of companies in a wide range of industries. He has authored a book on fairness opinions and common stock valuations, and he has previously testified as an expert on valuation before this and other Federal courts.

Respondent supports her determination with the testimony of her expert, Robert S. Weinberg (Weinberg). Weinberg is the president of R.S. Weinberg & Associates (RSWA), a consulting firm that he founded in 1971 to assist senior management in developing an analytical basis for corporate strategy. He earned bachelor of science and master's degrees in economics from New York University and Columbia University's Graduate School of Business, respectively. He began working in the brewing industry in 1966, as a vice president of Anheuser Busch in charge of long-term and strategic planning, and he remained at Anheuser-Busch until he founded RSWA.

Each expert ascertained his valuations by using a different methodology. Tonna valued the breweries by reviewing data that he amassed on the sales of nine other breweries between 1974 through 1991, which he believed to be comparable to the breweries before us. He subjectively extrapolated the values of the subject breweries from the range of the selling prices listed in the data. Tonna's report does not fully describe the property that was the subject of each reviewed sale, and it does not explain the methodology that he used to value the brands of beer.

Matthews arrived at his valuations by assuming that the fair market value of the Transferred Assets equaled the difference between: (1) The fair market value of petitioner and Olympia combined and (2) the fair market value of the assets not transferred to Heileman (i.e., the fair market value of the new

entity (New Pabst) of which Heileman was not a shareholder).
He ascertained the fair market values of petitioner, Olympia, and
New Pabst by reference to objective market price data, including
the competitive bids for the stock of Olympia and petitioner.
He did not ascertain a specific value for each of the breweries
and brands of beer.  Rather, he ascertained an aggregate value
for all of the Transferred Assets.

In general, Weinberg valued the breweries and some of the
brands of beer by way of a five-step discounted cash-flow model
that he designed.  First, he estimated the size of the total
market in total barrels and the expected share of the market that
a company or product could capture.  Second, he used these
estimates to project future sales.  Third, he modeled the cost
structure to measure the profits (or contribution to cash flow)
associated with a given level of sales.  Fourth, he projected
future profit from the projection of sales and the model of cost
structure.  Fifth, he discounted the future stream of profit to
arrive at its present value in 1983.  Weinberg did not reference
comparable sales because, he stated, he does not find them
meaningful in the beer industry and he could not find any.

The experts' conclusions on valuation, as well as the amounts listed in the Allocation Agreement and the notice of deficiency, are as follows:[11]

| Asset | Allocation Agreement | Notice of Deficiency | Weinberg | Tonna | Matthews |
|---|---|---|---|---|---|
| **Perry Brewery** | | | | | |
| Land | $864,000 | $1,053,845 | --- | --- | --- |
| Building | 29,747,000 | 36,283,242 | --- | $12,800,000 | --- |
| M&E | 58,731,000 | 71,635,832 | --- | 10,000,000 | --- |
| C-in-P | 1,170,000 | 1,427,081 | --- | --- | --- |
| | 90,512,000 | 110,400,000 | 105,100,000 | 22,800,000 | --- |
| | | | | | |
| **Portland Brewery** | | | | | |
| Land | 3,140,000 | 3,544,382 | --- | --- | --- |
| Building | 5,290,000 | 5,820,807 | --- | 6,500,000 | --- |
| M&E | 12,789,000 | 14,586,479 | --- | 4,000,000 | --- |
| C-in-P | 220,000 | 248,332 | --- | --- | --- |
| | 21,439,000 | 24,200,000 | 42,100,000 | 10,500,000 | --- |
| | | | | | |
| **San Antonio Brewery** | | | | | |
| Land | 1,196,000 | --- | --- | --- | --- |
| Building | 5,190,000 | --- | --- | 3,000,000 | --- |
| M&E | 6,300,000 | --- | --- | 2,500,000 | --- |
| | 12,686,000 | --- | 25,200,000 | 5,500,000 | --- |
| | | | | | |
| **Brands of Beer** | | | | | |
| Lone Star | --- | --- | 13,800,000 | 725,800 | --- |
| Henry Weinhard | --- | --- | 70,500,000 | 854,626 | --- |
| Red, White & Blue | --- | --- | 8,900,000 | 648,156 | --- |
| Buckhorn | --- | --- | --- | 21,925 | --- |
| Burgermeister | --- | --- | --- | 104,668 | --- |
| Blitz-Weinhard | --- | --- | --- | 246,795 | --- |
| Bohemian | --- | --- | --- | 108,288 | --- |
| Bavarian | --- | --- | --- | 28,007 | --- |
| Cascade | --- | --- | --- | 12,242 | --- |
| | 1,500,000 | 18,200,000 | 93,200,000 | 2,750,507 | --- |
| Total | 126,137,000 | 152,800,000 | 265,600,000 | 41,550,507 | |
| | | | | | |
| **Assets whose value is not in dispute herein** | 64,150,375 | --- | --- | --- | --- |

---

[11] Tonna valued the land and building together, and we show that total value under the categories of "Building". Matthews ascertained that the value of the Transferred Assets was in the range of $113 to $147 million, and was approximately $130 million. We show this amount as $130 million. We use the shorthand "M&E" and "C-in-P" to refer to "machinery and equipment" and "construction in process", respectively.

| Total--Transferred | | | | | |
|---|---|---|---|---|---|
| Assets | 190,287,375 | --- | --- | --- | 130,000,000 |

We do not accept the conclusions of any of the experts in toto, but we find parts of each of their opinions to be helpful in understanding the operation of the beer industry.[12]  With respect to Tonna, we find his testimony on the valuation issue to be unpersuasive.  Although he valued the subject breweries by reference to the sales of other breweries which he believed to be comparable, the dates of many of the purportedly comparable sales were too far removed from the valuation date at hand to allow for a meaningful comparison.  Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19-20 (1979).  Moreover, Tonna's report does not set forth enough data on these other breweries to allow the Court to make a meaningful comparison.  Although his report states the barrel capacity of his comparable breweries as well as certain other information with respect thereto, we do not know, for example, the quality, quantity, or attributes of the machinery and equipment, the size of the building, or the amount of land that were included in each purportedly comparable sale. We also do not know the particularities of any other asset that may have been included in each sale.  A proffered comparable sale without enough identifying data to explain the components of the sale is usually unhelpful to the Court in valuing property.

---

[12] In this regard, we will deny a motion made by petitioner at trial (and taken by the Court under advisement) to strike Weinberg's testimony.

See <u>Tripp v. Commissioner</u>, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; see also <u>Estate of Fittl v. Commissioner</u>, T.C. Memo. 1986-452.  In order for the Court to value property under a comparable sales methodology, we must first be satisfied that the qualities of the properties which provide the market benchmark are substantially similar to the property for which the value is sought, or that proper adjustments may be made to account for any differences. <u>Estate of Palmer v. Commissioner</u>, 839 F.2d 420, 424 (8th Cir. 1988), revg. on other grounds 86 T.C. 66 (1986); <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, <u>supra</u> at 19-20.  We are not so satisfied in this case.

We also are troubled by the fact that Tonna's methodology inappropriately focuses on the views of the buyer, to the exclusion of the seller.  See <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255 (expert's disregard for the views of a willing seller may be fatal to the expert's opinion); see also <u>Estate of Cloutier v. Commissioner</u>, T.C. Memo. 1996-49.  Although a buyer would most likely want to purchase the subject assets at Tonna's ascertained values, the test of fair market value rests on the concept of a hypothetical willing buyer <u>and</u> a hypothetical willing seller.  Ignoring the views of the willing seller is contrary to this well-established test, and, as mentioned above, may be fatal.  In this regard, our reading of Tonna's report does not persuade us that he ever considered whether a hypothetical

willing seller would sell the subject assets for the values that he ascertained. We find doubtful that a hypothetical brewing company would be willing to do so, if it were not under a compulsion to sell. Indeed, Tonna's adjustments to the prices of his comparable sales seem to be based primarily on the acumen that he acquired purchasing brewery equipment at the auctions of competitors that were undergoing liquidation. Although these prior purchases may reflect the price that a reasonable buyer would pay for brewery equipment at an auction, we do not believe that the purchases reflect the price at which a reasonable seller would sell the asset if the seller were not forced to sell its assets in liquidation. We also note that it is very relevant that Tonna begins the valuation portion of his report by stating that "A brewery is only worth what a buyer will pay for it", and that he believes (but we do not) that the value of used brewery equipment is inherently low because the equipment is large and bulky, and it is expensive to move from one location to another.

We are no more persuaded by the conclusion of Matthews as to the aggregate value of the subject assets. Although Matthews is the only expert with hands-on experience in the field of valuation, we do not believe that his methodology of valuing stock to ascertain the fair market value of the underlying assets is accurate under the facts herein. In Matthews' mind, the value of the subject assets at the time of valuation was approximately $66 million; i.e., his $130 million value for all the Transferred

assets less the $64,150,375 value of the other Transferred Assets that are not in dispute herein.  We do not believe that the record supports such a valuation.  Once again, we are not persuaded that a hypothetical seller would sell the subject assets at this price.

Nor are we persuaded by the valuation conclusions of Weinberg.  We observe that Weinberg is knowledgeable about the beer industry.  The fact that Weinberg is knowledgeable about this industry, however, does not compel us to credit his testimony on the Transferred Assets' fair market value for Federal income tax purposes.  At trial, we informed respondent's counsel that we considered Weinberg to be knowledgeable on the beer industry, but that we had serious doubts as to his ability to render a persuasive opinion on the fair market value of the subject assets.  We continue to harbor such doubts after thoroughly considering Weinberg's testimony with the benefit of the record as a whole.  First, Weinberg's expertise centers on advising clients in the brewing industry on new opportunities, and we do not find that he has expertise in valuing assets for Federal income tax purposes.  The thrust of Weinberg's expertise centers on marketing, economics, and the like, rather than on the ascertainment of fair market value for Federal income tax purposes.  We also note that Weinberg had never previously testified as an expert on the appraisal or valuation of breweries or brewing companies.

Second, we are disturbed by Weinberg's lack of regard for comparable sales. According to Weinberg, the brewing industry generally does not lend itself to a valuation by comparable sales because potential buyers change so rapidly in the industry. Weinberg testified that it was impossible for him to find sales of property comparable to the subject property because he considers a sale comparable only when the breweries are technically identical, the transactions occur during the same time period, and the potential purchasers are the same. We do not agree. Although it is true that the date of a sale should be relatively close in time to a valuation date in order to be meaningful, we are unpersuaded that the brewing industry does not lend itself to one of the most accurate forms of valuation (i.e., comparable sales). After carefully reviewing the sales of breweries that Tonna referenced as comparable to the breweries in this case, we believe that some of these sales might have been useful to our decision had they been properly developed.

Third, we are disturbed by the fact that Weinberg did not actually appraise or value the assets at issue. Instead, he analyzed a combination of the assets as a potential profit opportunity. When viewed against all evidence in the record, including the reports of the other experts, we find his analysis unpersuasive in establishing the fair market value of any of the assets for Federal income tax purposes. We find that his conclusions on the values of the subject assets are too high.

He ascertained that the fair market value of the brands of beer was $93.2 million. This amount is more than $90 million higher than both the amount shown in the Allocation Agreement and the amount ascertained by Tonna. It is approximately $90 million higher than the amount determined by respondent. It is almost three-fourths of the amount of the total consideration that Heileman paid for all of the Transferred Assets.

Fourth, Weinberg testified that the income production capability of a brewery's assets is the only measure of the assets' fair market values because brewery assets have value only to another brewery. We are not persuaded. Although Weinberg may be correct with respect to certain types of machinery and equipment which are specially customized to the brewing industry, a fact that we do not find, we are not persuaded that the same would hold true with respect to a brewery's land and/or building.

Having disregarded the valuation portion of all of the experts' opinions, we are left to determine the fair market value of the subject assets from the record before us. See Tripp v. Commissioner, 337 F.2d at 434; Goldstein v. Commissioner, 298 F.2d at 567. An actual sale of stock may be relevant in measuring the value of the underlying corporate assets. See Kalmon Shoe Manufacturing Co. v. Commissioner, 321 F.2d 189 (8th Cir. 1963), affg. T.C. Memo. 1962-56; Schmick v. Commissioner, 3 B.T.A. 1141 (1926); Hinkel v. Motter, 39 F.2d 159 (D. Kan. 1930); see also Ingram-Richardson, Inc. v. Commissioner, T.C.

Memo. 1972-157.  Under the unique facts at hand, we conclude that the value of the Transferred Assets was sufficiently related and inextricably bound to the value of the tendered common stock to allow us to rely on the tendered price as reflective of the fair market value of the Transferred Assets.  The climate of the beer industry leading up to the subject transaction was such that a brewer's assets were in demand by most of its competitors, and many smaller breweries were willing to sell their assets to a competitor.  Many unrelated persons (including Heileman, Jacobs, and Kalmanovitz) were attempting to acquire control over petitioner, which would inevitably include control over petitioner's assets, and an arena of competitive, arm's-length bidding was created from the various attempts to acquire that control.  All of these persons were extremely knowledgeable of the beer industry and the business world in general, as well as the worth of breweries and brewery assets such as those breweries and assets that are before us today.  Although everyone ostensibly bid for petitioner's stock, rather than its assets, petitioner's management aimed during the bidding war to allow petitioner's shareholders to realize petitioner's underlying asset value.  The bidding and negotiations related thereto were driven with that thought in the mind of petitioner's management, and the fiduciary obligations of petitioner's management (as well as of the Board) forced them to resist any attempt to buy petitioner's stock for less than petitioner's intrinsic value.

The transaction between Heileman and petitioner resulted in Heileman's acquiring the desired assets of petitioner. Heileman wanted these assets in order to broaden its presence in the marketplace. In general, all of the suitors of petitioner's stock wanted to buy specific assets of petitioner, and they were not hesitant about discarding the undesired assets. From the suitors' point of view, it generally was not the stock that they ultimately wanted; it was petitioner's assets. The 1982 Consent Degree, for example, mandated that Heileman could keep only some of petitioner's assets. Likewise, the Agreement in Principle provided for Heileman to retain certain assets of petitioner, while disposing of the rest; the Put Agreement surrounding the First JMSL Offer contemplated the relinquishment of some of petitioner's assets; and the Second JMSL Offer contemplated a second step merger involving petitioner. In order for Heileman or any of the other suitors to get the assets that they desired, however, they needed to purchase petitioner's stock.

We believe that petitioner and its suitors both desired to transfer the stock (and the assets that went along therewith) at the best price possible, from each side's point of view, and that each side fought intensely to reach its desired end. Under the facts herein, including the environment that was created by the competitive bidding war, we believe that the $32 per share price paid for petitioner's stock by Heileman is the best indicium of the fair market value of petitioner's assets. We recognize that

this $32 price is significantly higher than the value of the stock as traded on the market before the bidding war materialized in 1982. All the same, we believe that the lower trading value did not reflect the actual value of petitioner's assets, either individually or as a whole. We also believe that the lower bids that were made for petitioner's stock at the start of the bidding war were nothing more than attempts by the bidders to pay a premium on the trading price of petitioner's stock, while buying its more valuable assets at less than their fair market value. In this regard, we reject petitioner's claim that some part of the $32 tender price is a premium that Heileman paid to obtain the Transferred Assets. Although Heileman began its bidding at $27.50 per share, the $32 price that it ultimately paid was inevitably driven by the force of the market as to the actual value of petitioner's assets.

Respondent argues that the bidding war placed petitioner's management in a state of duress because they knew that a takeover of the company was imminent and inevitable. Respondent alleges that petitioner was forced to accept the Heileman proposal because it wanted to avoid other takeover attempts. Respondent concludes that the "peculiar circumstances" of this case forced petitioner to transfer its assets to Heileman for less than their fair market value. See Bixby v. Commissioner, 58 T.C. 757, 776 (1972). We do not agree. In contrast to respondent, we do not believe that the subject transaction was driven by "peculiar

circumstances" that made petitioner willing to transfer its assets to Heileman at less than their fair market value. We also do not find that petitioner and Heileman were compelled to buy or to sell, although they both may have had individual motivations for seeking a consummation of a deal between them. We find from the record that the parties to the transfer of the assets thoroughly deliberated the transfer before it actually occurred. Heileman began discussing a combination with petitioner in 1982, and the Justice Department was consulted shortly thereafter to express its views on the legality of such a combination. We find it hard to believe that the discussions between petitioner and Heileman were anything but adversarial, legitimate, and at arm's length, and we find nothing in the record to persuade us otherwise.[13] As brewers in the industry, both Heileman and petitioner were knowledgeable of the industry and the details of the transaction. The agreement between them also had independent business significance, undoubtedly adding to their realistic economic assessment of the transaction. Although the values ascribed in the Allocation Agreement are not necessarily determinative of the actual fair market values of the underlying

---

[13] For example, the 1982 Consent Decree specifically prohibited Heileman from managing or controlling petitioner or Olympia in any manner directly or indirectly. We also bear in mind that, during these discussions, the Board would have been subject to a duty of loyalty to the minority shareholders, as would any controlling shareholder. See Pepper v. Litton, 308 U.S. 295, 306 (1939).

assets, these values are very persuasive as to the assets' true fair market value, given the fact that the parties to the agreement were dealing at arm's length and the agreement had independent economic significance.  See Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37 (1937); Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Simons Brick Co. v. Commissioner, 45 F.2d 57 (9th Cir. 1930), affg. 14 B.T.A. 878 (1928).

For the foregoing reasons, we hold that the value of the Transferred Assets equals the $190,287,375 of consideration that Heileman remitted to petitioner in connection with the transfer. Given the fact that neither party has challenged the Allocation Agreement's allocation of this consideration, and that we see nothing in the record that persuades us that the amount assigned to each asset is not the fair market value of that asset, we choose to respect each of the amounts listed therein, and we so hold.  In reaching all of our holdings herein, we have considered all arguments by the parties, and, to the extent not mentioned above, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.